## IN THE FEDERAL DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CHECKER CAB PHILADELPHIA, INC., :
t/a 215-GET-A-CAB                 :
AF TAXI, INC.                     :      DOCKET NO.
AG TAXI, INC.                     :
AGB TRANS, INC.                   :
ATS CAB, INC.                     :
BATYAM CAB COMPANY                :
BOND TAXI, INC.                   :
BSP TRANS, INC.                   :
DB TAXICAB CO.                    :
DG CAB, INC.                      :
DR CAB, INC.                      :
FAD TRANS, INC.                   :
GA CAB, INC.                      :
GD CAB, INC.                      :
GLOBAL CAB, INC.                  :
GN TRANS, INC.                    :
GOD BLESS AMERICA TRANS, INC.     :
GOR TRANS, INC.                   :
GRACE TRANS, INC.                 :
IA TRANS CO, INC.                 :
IL TRANS, INC.                    :
JANE CAB COMPANY                  :
JAYDAN, INC.                      :
KB TRANS, INC.                    :
L&M TAXI, INC.                    :
LAN TRANS CO.                     :
LMB TAXI, INC.                    :
MAF TRANS, INC.                   :
MDS TRANS, INC.                   :
MG TRANS CO., INC.                :
MO TAXI, INC.                     :
NOBLE CAB, INC.                   :
RAV TRANS, INC.                   :

RD CAB, INC.                                          :
SAJ TRANS, INC.                                      :
SF TAXI, INC.                                        :
SOCIETY TAXI, INC.                                   :
SS TAXI CAB, INC.                                    :
STEELE TAXI, INC.                                    :
TGIF TRANS, INC.                                     :
V&S TAXI, INC.                                       :
VALTRANS, INC.                                       :
VB TRANS, INC., and                                  :
VSM TRANS, INC.                                      :
          PLAINTIFFS                                 :
          v.                                         :
                                                     :
UBER TECHNOLOGIES, INC.                              :
TRAVIS KALANICK                                      :
JON FELDMAN                                          :
RASIER, LLC                                          :
GEGEN, LLC                                           :
GOOGLE VENTURES, LLC                                 :
IGOR KHMIL                                           :
LEE RUDAKEWYCH                                       :
WILLIAM E. SMITH                                     :
SHAHRAIR CHOWDHURY                                   :
JEAN LITARD JEAN-PHILLIPPE                           :
FELIPE ISRAEL MUNOZ MORENO                           :
PHARIDE ERNEST ROUFAI                                :
ISFANDIYOR THUSANOV                                  :
GEORGE ROBERT HOLMES, JR.                            :
JONATHON M. BRANNAN                                  :
FELIX A. DELAHOZ                                     :
RAYMOND REYES                                        :
VICTOR ABIODUN FAKOLUJO                              :
TIMOTHY JUDELSOHN                                    :
DAVID A. BIEKER                                      :
WAQAR Y. GHUMMAN                                     :
ZAYE EL BEY                                          :
          DEFENDANTS                                 :

## CIVIL ACTION COMPLAINT

The above named Plaintiffs, by and through their attorneys, Salaman, Grayson, & Henry, P.C., hereby demand judgment against the above named Defendants, upon the following causes of action:

## INTRODUCTION

Not since the days of bootlegging has there been a criminal enterprise so brazen and open as to attract hundreds of millions of dollars in investment from investment bankers and to operate in blatant violation of federal and state law as the Uber enterprise. Their outrageous acts are legion, whether charging $100 in "surge pricing" to drive Australians away from last week's hostage siege, to tracking one night stands, to hiring formerly incarcerated felons, to threatening to investigate journalists' private lives.

In Philadelphia, regulators have seized its vehicles and cited its drivers and the enterprise's response has been to indemnify its drivers, place lawyers at the courts to bail out its drivers and vehicles, using its illegally obtained funds to immediately return them to their illegal activities.

The Pennsylvania Legislature, like those of other states, has enacted a complex structure of regulations to protect the public and taxicab industry. These statutes and regulations address who may own and operate a taxicab; safety standards for vehicles used in the transportation of the public; language proficiency

1

of drivers; criminal background checks; insurance requirements; fares that may be charged and how many vehicles may operate. The importance that the legislators place upon adherence with these complex regulations is evidenced by the fact that it is a criminal misdemeanor offense to operate a taxicab outside of this regulatory structure.

Uber has sought to obtain permission from the state regulators to operate within City of Philadelphia, but not having received such authority has chosen to nonetheless openly operate in violation of the civil and criminal statutes. This is a conscious business model that they have undertaken across the country and indeed across the globe in a belief that their funding will allow them to outspend the regulators.

They have placed themselves above the law.

I. **PLAINTIFFS**

1.      Plaintiff, Checker Cab Philadelphia, Inc., trading as 215-GET-A-CAB ("Checker"), is a Pennsylvania corporation engaged in business in Pennsylvania, which holds a certificate of public convenience issued by the Philadelphia Parking Authority ("Authority" or "PPA") that authorizes it to provide medallion taxicab dispatch service in Philadelphia, with offices located at 2301 Church Street, Philadelphia, Pennsylvania.

2

2.      Checker uses a technology platform that includes a smartphone application, called 215-GET-A-CAB ("Checker app"), which enables members of the riding public to order taxicab service with the touch of a button on their smartphone devices.

3.      The Checker app has been approved by the Authority for use by Checker in Philadelphia to dispatch service orders to certified medallion taxicabs.

4.      The remaining Plaintiffs are Pennsylvania corporations that own and operate medallion taxicabs in Philadelphia, with offices located at 2301 Church Street, Philadelphia, Pennsylvania.   (hereinafter collectively referred to as "Medallion Taxicab Plaintiffs")

5.      For each taxicab it operates in Philadelphia, each Medallion Taxicab Plaintiff owns one medallion and a corresponding certificate of public convenience issued by the Authority.

6.      A vehicle may not be operated as a taxicab in Philadelphia, unless a certificate of public convenience is issued by the Authority authorizing the operation of the taxicab and a medallion is attached to its hood.

7.      A medallion is a property right that has significant value and may be pledged to lenders or creditors as security for debt.

8.      Many of the Medallion Taxicab Plaintiffs have pledged their medallions to lenders and creditors as security for debt.

3

9.      Within the last year, medallions have been valued at $520,000 each.

10.     All of the Medallion Taxicab Plaintiffs accept service orders dispatched through the Checker technology platform, including service orders generated by the Checker app.

## II.    DEFENDANTS

11.     Upon information and belief, Defendant, Uber Technologies, Inc. ("Uber"), is a Delaware corporation engaged in business in Pennsylvania, with a place of business located at 1455 Market Street, 4th Floor, San Francisco, California and an office in Pennsylvania located at 109 S. 13th Street, Suite 2S, Philadelphia, Pennsylvania.

12.     Defendant Uber developed a technology platform that includes a smartphone application (the "Uber app"), which enables members of the riding public to order transportation service with the touch of a button on their smartphone devices.

13.     The Uber app has not been approved by the Authority for use in Philadelphia.

14.     Defendant Uber is not authorized by the Authority to provide any type of transportation or dispatch service in Philadelphia and it does not own any medallions.

15.     Upon information and belief, Defendant, Travis Kalanick ("Kalanick"), is a citizen and resident of California, the co-founder of Defendant Uber, an investor in Uber, and Uber's Chief Operating Officer, with an office located at 1455 Market Street, 4th Floor, San Francisco, California, and an office in Pennsylvania located at 109 S. 13th Street, Suite 2S, Philadelphia, Pennsylvania.

16.     Upon information and belief, Defendant, Jon Feldman ("Feldman"), is a citizen and resident of Pennsylvania, an employee of Defendant Uber, and the General Manager of Defendant Uber's Philadelphia office, with an office located at 109 S. 13th Street, Suite 2S, Philadelphia, Pennsylvania.

17.     Upon information and belief, Defendant, Gegen, LLC ("Gegen") is a Delaware limited liability company engaged in business in Pennsylvania and a wholly owned subsidiary of Defendant Uber, with offices in Pennsylvania located at 109 S. 13th Street, Suite 2S, Philadelphia, Pennsylvania.

18.     Upon information and belief, Defendant Uber, is the managing member of Defendant Gegen and its sole member.

19.     Defendant is authorized by the Authority to provide limousine service in Philadelphia and is authorized by the Pennsylvania Public Utility Commission ("Commission" or "PUC") to act as a broker of motor carrier services in Pennsylvania, including Philadelphia, but is not authorized to provide taxicab service or dispatch service in Philadelphia and does not own any medallions.

20.     Upon information and belief, Defendant, Rasier, LLC ("Rasier"), is a Delaware limited liability company engaged in business in Pennsylvania and a wholly owned subsidiary of Defendant Uber, with offices in Pennsylvania located at 109 S. 13th Street, Suite 2S, Philadelphia, Pennsylvania.

21.     Upon information and belief, Defendant Travis Kalanick is the managing member of Defendant Rasier, LLC and its sole member.

22.     Defendant Rasier is not authorized by the Authority to provide any type of transportation or dispatch service in Philadelphia and does not own any medallions.

23.     Defendants Gegen and Raiser are jointly referred to herein as "Uber Subsidiaries" or jointly with Defendant Uber as "Uber and its subsidiaries."

24.     Upon information and belief, neither Defendant Gegen nor Defendant Raiser has any employees and all of their acts and functions are performed by employees of Defendant Uber, acting within the course and scope of their employment with Defendant Uber, under the supervision, direction and control of Defendants Kalanick and Feldman.

25.     Upon information and belief, Defendant Google Ventures, LLC ("Google"), is an investor in Defendant Uber, with offices located at 1600 Amphitheatre Parkway, Mountain View, California.

26.     Upon information and belief, Defendant, Igor Khmil ("Khmil"), is an adult individual with a residence at 3338 Richlieu Road, Apartment P 220, Bensalem, Pennsylvania.

27.     Upon information and belief, Defendant, Lee Rudakewych ("Rudakewych"), is an adult individual with a residence at 529 Waln Road, Glenside, Pennsylvania.

28.     Upon information and belief, Defendant, William E. Smith ("Smith"), is an adult individual with a residence at 5907 N. 3rd Street, Philadelphia, Pennsylvania.

29.     Upon information and belief, Defendant, Shahariar Chowdhury ("Chowdhury"), is an adult individual with a residence at 81 Keystone Avenue, Upper Darby, Pennsylvania.

30.     Upon information and belief, Defendant, Jean Liotard Jean-Philippe ("Jean-Philippe"), is an adult individual with a residence at 521 W. King Street, Lancaster, Pennsylvania.

31.     Upon information and belief, Defendant, Felipe Israel Munoz Moreno ("Munoz Moreno"), is an adult individual with a residence at 112 Fir Drive, Collegeville, Pennsylvania.

32.     Upon information and belief, Defendant, Pharide Ernest Roufai ("Roufai"), is an adult individual with a residence at 1901 West Chester Pike, Apartment 9E, Havertown, Pennsylvania.

33.     Upon information and belief, Defendant, Isfandiyor Tuhsanov ("Tuhsanov"), is an adult individual with a residence at 301 Heights Lane, Apartment 48D, Feasterville, Pennsylvania.

34.     Upon information and belief, Defendant, George Robert Holmes, Jr. ("Holmes"), is an adult individual with a residence at 7701 Bustleton Avenue, Apartment 307, Philadelphia, Pennsylvania.

35.     Upon information and belief, Defendant, Jonathon M. Brennan ("Brennan"), is an adult individual with a residence at 100 Ryans Run, Sicklerville, New Jersey.

36.     Upon information and belief, Defendant, Felix A. Delahoz ("Delahoz"), is an adult individual with a residence at 1052 E. 23rd Street, Paterson, New Jersey.

37.     Upon information and belief, Defendant, Raymond Reyes ("Reyes"), is an adult individual with a residence at 763 East 32nd Street, Brooklyn, New York.

38.   Upon information and belief, Defendant, Victor Abiodun Fakoluto ("Faloluto"), is an adult individual with a residence at 957 Bristol Pike, Apartment E9, Bensalem, Pennsylvania.

39.   Upon information and belief, Defendant, Timothy Judelsohn ("Judelsohn"), is an adult individual with a residence at 322 Loney Street, Apartment 3, Philadelphia, Pennsylvania.

40.   Upon information and belief, Defendant, David A. Bieker ("Bieker"), is an adult individual with a residence at 62 Grand Banks Circle, Marlton, New Jersey.

41.   Upon information and belief, Defendant, Waqar Y. Ghumman ("Ghumman"), is an adult individual with a residence at 53 Axford Road, Trenton, New Jersey.

42.   Upon information and belief, Defendant, Zaye El Bey ("El Bey") is an adult individual with a residence at 3716 North Bouvier Street, Philadelphia, Pennsylvania.

43.   Defendants Khmil, Rudakewych, Smith, Chowdhury, Jean-Phillippe, Munoz Moreno, Roufai, Thusanov, Khafizov, Holmes, Brennan, Delahoz, Reyes, Fakolujo, Judelsohn, Bieker, and Ghumman, are hereinafter collectively referred to as "Uber Drivers."

44.    None of the Defendant Uber Drivers is authorized to provide any type of transportation service in Philadelphia and none of them own any medallions.

## JURISDICTION AND VENUE

45.    This Court has original jurisdiction over this action pursuant to 28 U.S.C. §1331 (federal question jurisdiction) because it involves a claim under Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a) and Section 1962(a), (c) and (d) of the Racketeer Influenced and Corrupt Organizations Act ("RICO Act").

46.    This Court also has original jurisdiction over this action pursuant to 28 U.S.C. §1338(b) because it involves claims of unfair competition joined with a substantial and related claim under the trademark laws, specifically Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a).

47.    Finally, this Court also has supplemental jurisdiction over this action pursuant to 28 U.S.C. §1367 because it involves state law claims of unfair competition that are so related to Plaintiff's original jurisdiction claims that they form part of the same case or controversy under Article III of the United States Constitution.

48.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district and because each of the defendants regularly

transacts, does, and solicits business in this District, and is subject to personal jurisdiction in this District and the harm complained of occurred in this District.

## HOW UBER WORKS IN PHILADEPHIA

49.    Defendant Uber is the developer of a technology platform that includes, *inter alia*, the Uber app and a website (the "Uber website"), which enables members of the riding public to order a ride with the touch of a button.

50.    Rides ordered through Uber's technology platform are dispatched to third parties, including independent third party transportation providers, under agreements with Defendant Uber or Uber's subsidiaries, including Defendants Gegen and Rasier.

51.    Before they can use the Uber technology platform, members of the riding public have to create an account by supplying their name, mobile telephone number, email, language, and billing information to Defendant Uber on the Uber website, which they may access on any computing device.

52.    A valid credit card is required to use the Uber technology platform.

53.    In order to sign up to use the Uber technology platform, members of the riding public must agree to the Uber privacy policy and certain terms and conditions that govern the use of the "applications, websites, content, products, and services" made available by Defendant Uber and its subsidiaries.

54.     Once an account is created, a member of the riding public may download the Uber app for free and install it on a smartphone device.

55.     Once installed, a member of the riding public may log onto the Uber technology platform and order a ride from one of the Uber services using the Uber app or the Uber website.

56.     The Uber technology platform offers four services (the "Uber services") in Philadelphia: UberX, UberFamily, Black Car, and SUV.

**UberX service**

57.     UberX is Uber's low-cost alternative service for up to four passengers.

58.     An Uber subsidiary, Defendant Raiser, arranges UberX service under agreement with independent third party providers.

59.     Neither Defendant Uber nor Defendant Raiser provides UberX service directly and neither owns any vehicles that are used to provide UberX service.

60.     As noted, neither Defendant Uber nor Defendant Rasier has authorization to provide taxicab service in Philadelphia and does not own any medallions.

61.     Defendant Raiser arranges UberX service by agreement with private individuals, wherein the private individuals agree to accept ride orders for UberX

service using Uber's technology platform and provide the transportation in their own private passenger vehicles in exchange for a share of the fare.

62.    None of the private drivers who provide UberX service are authorized by the Authority to provide taxicab service in Philadelphia and none own medallions.

## UberFamily service

63.    Uber Family is UberX service with a $10 surcharge for child car seats provided by the driver.

64.    Defendant Raiser arranges UberFamily service in the same way that it arranges UberX service.

65.    None of the private drivers who provide UberFamily service is authorized by the Authority to provide taxicab service in Philadelphia and none own medallions.

## Black Car Service

66.    Black Car is Defendant Uber's original service, which is luxury sedan service for up to four passengers.

67.    An Uber subsidiary, Defendant Gegen, arranges Black Car service under agreement with independent third party providers.

68.    Neither Defendant Uber nor Defendant Gegen provides Black Car service directly and neither owns any vehicles.

69.    Defendant Gegen has authorization to provide limousine service in Philadelphia, but it does not have authorization to provide taxicab service in Philadelphia and does not own any medallions.

70.    Defendant Gegen also has a PUC license to act as a broker of motor carrier service in Pennsylvania, including Philadelphia, but the broker license does not authorize Defendant Gegen to arrange the provision of taxicab service by an individual or an entity that is not authorized to provide taxicab service in Philadelphia.

71.    Defendant Gegen arranges Black Car service by entering into agreements with independent drivers, who agree to accept ride orders for Black Car service using the Uber technology platform and provide Black Car service in exchange for a share of the fare.

72.    None of the independent drivers with whom Gegen contracts have authorization to provide taxicab service in Philadelphia or own medallions.

73.    Defendant Gegen arranges Black Car service using two types of agreements.

74.    First, Defendant Gegen enters into agreements with independent drivers who have authorization to provide limousine service in Philadelphia, or who drive for another company that has authorization to provide limousine service in Philadelphia, wherein the independent driver agrees to accept ride orders for

14

Black Car, dispatched through the Uber technology platform, and to provide the transportation in exchange for a share of the fare.

75.     Second, Defendant Gegen enters into agreements with independent drivers who own their own luxury sedans, but do not have authorization to provide limousine service in Philadelphia, wherein Defendant Gegen agrees to register the independent driver's vehicle with the Pennsylvania Department of Motor Vehicles ("PennDOT") in its own name, and the independent driver agrees to lease back his or her own vehicle from Gegen, accept ride orders for Black Car, dispatched through the Uber technology platform and to provide the transportation in exchange for a share of the fare.

**SUV service**

76.     SUV service is a premium service for up to six passengers, which is significantly more expensive than Black Car.

77.     Defendant Gegen arranges SUV service in the same way that it arranges Black Car Service.

78.     None of the private drivers that provide SUV service are authorized by the Authority to provide taxicab service in Philadelphia and none own medallions.

79.     Once the vehicle type is selected, the pick-up location must be set and confirmed and the ride order is complete.

15

80.    Once ride order is confirmed, the nearest available Uber driver, who is logged onto the Uber technology platform via the internet using a smartphone device, is located using a Global Positioning System ("GPS") and the ride order is dispatched to that driver.

81.    Once an Uber driver accepts the ride order, the Uber driver's telephone number is transmitted to the Uber app user, along with an estimated time of arrival.

82.    Once the Uber app user is picked up, the Uber Driver activates a meter to calculate the fare by pressing an icon on his smartphone device.

83.    Fares are calculated using rates based on a combination of the length and duration of the trip.

84.    Rates increase during periods of high demand, such as before or after a sporting event, and during emergencies, such as during a hostage crisis or a snow storm ("surge pricing").

85.    At the conclusion of the trip, payments are handled automatically by the Uber service through the credit card on file with the account.

86.    Tips are not necessary.

## HOW 215-GET-A-CAB WORKS IN PHILADELPHIA

87.    Checker's technology platform functions in much the same way as Uber's technology platform, with several significant differences.

16

88. Plaintiff Checker utilizes a technology platform that enables users arrange taxicab service by calling 215-GET-A-CAB or by using the Checker app, 215-GET-A-CAB.

89. Before they can use the Checker app, members of the riding public have to create an account by supplying their name, mobile telephone number, and email to Plaintiff Checker, but they do not have to supply any billing information.

90. A valid credit card is not required to use the Checker app.

91. Once an account is created, members of the riding public can download the Checker app for free.

92. In order to download the Checker app, members of the riding public must agree to Checker's privacy policy and certain terms and conditions that govern the use of the Checker app.

93. Once installed, a member of the riding public may logon to Checker's technology platform and order taxicab service.

94. Plaintiff Checker only offers certified medallion taxicab service on its technology platform, but Checker app users may choose to be transported in a sedan, minivan or wheelchair accessible vehicle ("WAV").

95. Once the pick-up location and destination is set and confirmed and the vehicle type selected, the ride order is complete and is automatically dispatched through Checker's PPA-approved electronic dispatch system to the nearest

17

available certified medallion taxicab that is logged on to Checker's technology platform.

96.    For safety reasons, certified medallion taxicab drivers do not use smartphone devices in connection with the Checker app.

97.    Once the medallion taxicab driver accepts the ride order, the estimated time of arrival is transmitted to the Checker app user.

98.    Once the Checker app user is picked up, the certified medallion taxicab driver activates the PPA-approved meter installed in the taxicab.

99.    Fares are calculated using PPA-approved rates based on a combination of the time and distance of the trip and are posted in the passenger compartment of the taxicab.

100.   Medallion taxicabs are not permitted to utilize surge pricing.

101.   At the conclusion of the trip, the customer may choose the form of payment and may use the credit card processing device installed in the taxicab or pay cash.

102.   Tips are not necessary.

## THE UBER SERVICES ARE TAXICAB SERVICES

103.   There are two types of transportation service regulated by the Authority in Philadelphia:  taxicab service and limousine service.

104.   Each of the four Uber services offered on the Uber technology platform, Black Car, UberX, SUV and UberFamily, is a taxicab service, also known as call or demand service, and is provided in a taxicab as these terms are defined under Pennsylvania law.

105.   The terms "taxicab", "taxicab service", and "call or demand service" are defined by statute in Pennsylvania.

106.   The General Local Government Law, which governs taxicab and limousine service in Philadelphia and empowers the Authority to regulate them, defines the term "taxicab," in pertinent part, as follows:

> A motor vehicle designed for carrying no more than eight passengers, exclusive of the driver, on a call or demand service basis and used for the transportation of persons for compensation ..."

53 Pa. C.S. §5701

107.   The General Local Government Law, also defines the terms "call or demand service" or "taxicab service,", which may be used interchangeably as they share a common definition.

108.   These terms "call or demand service" and "taxicab service" are defined as follows:

> Local common carrier service for passengers, rendered on either an exclusive or nonexclusive basis, where the service is characterized by the fact that passengers normally hire the vehicle and its driver either by telephone call or by hail, or both. The term does not include limousine service.

53 Pa.C.S. §5701

109.   The General Assembly adopted these definitions to distinguish taxicab service from limousine service, the two types of motor carrier service regulated by the Authority under the General Local Government Law.

### The Uber services are offered on a call or demand basis

110.   According to these definitions, the fundamental characteristic that distinguishes taxicab service from limousine service is the manner in which the service is procured.

111.   Taxicab service is procured on a demand basis, either by call or by street hail, while limousine service is procured on an advance reservation basis.

112.   The sole factor that distinguishes on demand service from advance reservation service is the service requestor's need.

113.   If a rider needs or requests service immediately, the service is on demand; if the rider needs or requests service at a specified time in the future, the service is by advance reservation.

114.   The mere fact that time elapses between a service request and the arrival of a vehicle does not transform on demand service into advance reservation service.

115.   Also, the means by which the service request is communicated does not transform on demand service into advance reservation service.

116.   On demand service may be requested by means of a street hail, voice call, or smartphone app, sometimes referred to as an "e-hail."

117.   Only the needs of the service requestor determine whether the service is on demand or by advance reservation.

118.   The Uber services are on demand services because they cannot be procured on an advance reservation basis.

119.   On its website, Defendant Uber states:

With Uber, all pickups are made on demand and drivers arrive within minutes, so there's no need to schedule a ride in advance.

**The Uber services charge taxicab rates**

120.   Another fundamental characteristic that distinguishes taxicab service from limousine service is the manner in which riders are charged for service.

121.   Taxicab fares are calculated using rates that are based on a combination of time and distance and are measured by a taxi meter; limousine charges are calculated using rates that are based solely on time in increments of thirty minutes or more and the use of meters is prohibited.

122.   A taxicab fare covers one point-to-point trip; a limousine charge covers the use of a vehicle for a specified period of time, no matter how many trips are performed during the specified period.

123.   The Taxicab Medallion Plaintiffs charge rates that are based on a combination of time and distance, according to an Authority-approved tariff.

21

124.   The PPA-approved tariff for metered taxicab service in Philadelphia is as follows:

| | |
|---|---|
| First 1/10 mile (flag drop) or fraction thereof: | $2.70 |
| Each additional 1/10 mile or fraction thereof: | $0.23 |
| Each 37.6 seconds of wait time: | $0.23 |
| Flat rate from Center City to Airport: (multiple passengers) | $28.50 |
| Flat rate from Airport to Center City: (per passenger) | $28.50 |
| Minimum Fare from Airport: (plus $1.50 egress fee above $11.00) | $11.00 |

125.   By statute, these rates are uniform and can only be modified upon investigation and approval by the Authority; all taxicabs in Philadelphia are required to charge these rates and are prohibited from changing these rates without prior approval from the Authority.

126.   The Authority does not permit certified medallion taxicabs to use "surge pricing" during periods of high demand or emergency.

127.   All four of the Uber services charge rates that are based on a combination of time and distance.

128.   Only Defendant Gegen has a tariff on file with the Authority.  A true and correct copy of this tariff is attached hereto as Exhibit "A."

129.   On its website, Defendant Uber lists the rates for UberX in Philadelphia, which are based on a combination of time and distance as follows:

| | |
|---|---|
| Base fare: | $3.00 |
| Below 11 mph: | .30 per minute |

| | |
|---|---|
| Above 11 mph: | $2.25 per mile |
| Safe ride fee: | $1.00 |
| Minimum fare: | $7.00 |
| Cancellation fee: | $10 |

130.  These rates are not approved by the Authority and Defendant Uber changes them whenever it wants, without Authority approval.

131.  Rates for UberFamily are the same as the rates for UberX with an unapproved $10 surcharge for each child car seat.

132.  Defendant Uber also employs "surge pricing", without Authority approval, to double or triple rates for UberX and UberFamily during periods of high demand or emergency.

133.  Defendant Uber also uses the Black Car and SUV services to charge rates based on a combination of time and distance that are not approved by the Authority.

134.  Defendant Uber lists the rates for Black Car and SUV service on its website, which are based on a combination of time and distance, as follows:

| | |
|---|---|
| Black Car Base Fare: | $7 + Total Travel Time |
| SUV Base Fare: | $14 + Total Travel Time |

Want more details? Check our fare estimator.

| | Black Car | SUV |
|---|---|---|
| Flat fee between Airport & Naval Yard: | $35 | $45 |
| Flat fee between Airport & Center City: | $45 | $65 |
| Flat fee between Airport & North of Vine: | $55 | $75 |

135.   The Uber website offers no information about how the fare estimator works; however, the term "Total Travel Time" suggests that rates are based on actual time and not time increments of thirty minutes or more as required for limousine rates.

136.   Defendant Uber also employs "surge pricing," without Authority approval, to double or triple rates for Black Car and SUV service during periods of high demand or emergency.

137.   Based on the foregoing, it is clear that the rates for the Uber services are taxicab rates and not limousine rates because they are based on a combination of time and distance and on increments of less than thirty minutes.

### The Uber Services use taxi meters

138.   The final characteristic that distinguishes taxicab service from limousine service is the use of meters.

139.   Taxicabs in Philadelphia are required to use Authority-approved meters, while limousines are prohibited from using meters.

140.   Meters are not required for limousine service because rates are based solely on time in increments of thirty minutes or more.

141.   Thus, only a clock is needed to calculate charges for limousine service.

142.   Defendant Uber uses the Uber technology platform to calculate rates.

24

143.   The Uber technology keeps track of the time and distance for each trip calculates the fare based on whatever rates it is using at the time and displays the fare on both the smartphone devices of the driver and the app user.

144.   Based on the foregoing, each of the Uber services is a taxicab service within the meaning of the General Local Government Law because it offers and provides transportation service on demand, uses rates based on a combination of time and distance and uses meters to calculate and charge fares.

## WHY THE UBER SERVICES ARE UNLAWFUL IN PHILADEPHIA

145.   The Uber Services are unlawful in Philadelphia because they are offered, facilitated and provided by individuals and entities without proper authorization from the Authority and they are offered, facilitated and provided by drivers and vehicles that are not subject to regulatory oversight by the Authority and which to do not comply with many of the Authority's regulations pertaining to taxicabs.

### Unauthorized taxicab service

146.   A vehicle may not be operated as a taxicab with citywide call or demand rights in cities of the first class unless a certificate of public convenience is issued by the authority authorizing the operation of the taxicab and a medallion is attached to the hood of the vehicle.  53 Pa. C.S. §5714(a)

147.   Operating an unauthorized vehicle as a taxicab, or giving the appearance of offering call or demand service with an unauthorized vehicle, without first having received a certificate of public convenience and a medallion is a nontraffic summary offense in the first instance and a misdemeanor of the third degree for each offense thereafter.  53 Pa. C.S. §5714(f)

148.   The owner and the driver of a vehicle being operated as or appearing as a taxicab without a certificate of public convenience and a medallion are also subject to civil penalties.  53 Pa. C.S. §5714(f)

149.   As set forth above, the Uber services are taxicab services.

150.   Accordingly, Defendants Uber, Gegen, Raiser, and Defendant Drivers violate 53 Pa. C.S. §5714(a), when they offer, facilitate or provide the Uber services in Philadelphia.

**Failure to comply with taxicab regulations**

151.   Notwithstanding the fact that Defendants Uber, Gegen, Rasier and Defendant Drivers lack authorization to provide taxicab service in Philadelphia, the Uber services are also unlawful because they are offered, facilitated and provided by drivers and vehicles that are not subject to regulatory oversight by the Authority.

152.   Furthermore the Uber services are unlawful because they do not comply with many of the Authority's regulations pertaining to taxicabs, including

vehicle equipment and driver safety standards, requirements for taxicab rates and for insurance.

153.   A vehicle operated as a medallion taxicab must be less than eight years old, must have less than 135,000 miles on its odometer when placed into service and less than 250,000 miles when re-inspected by the Authority, must be distinctively marked, numbered and painted for identification purposes, and must be equipped with a PPA-approved meter, GPS navigation system, panic button, dome light and protective shield.  53 Pa. C.S. §5714, and 52 Pa. Code §1017.11

154.   All medallion taxicabs are required to utilize a PPA-approved centralized dispatcher with capability of communicating with drivers via two-way voice communications.  53 Pa. C.S. §5721; 1017.5(b)(3)

155.   A vehicle operated as a medallion taxicab is subject to a pre-service inspection, biannual inspections, random field inspections, an annual department of motor vehicle inspection, and post-accident inspections, and must be maintained to be in continuous compliance with the Authority's safety standards.  52 Pa. Code Ch. 1017

156.   A driver of a medallion taxicab must be at least 21 years old, hold a valid driver's license, pass an English language proficiency test, a medical examination, a criminal background check, a department of motor vehicle check,

be eligible to work in the United States, and must be trained and certified by the Authority. 53 Pa. C.S. §5706, 52 Pa. Code Ch. 1021

157.   In addition, an individual is ineligible to drive a taxicab if his or her driver's license has been suspended, revoked or otherwise invalidated at any time within the last 6 months immediately preceding an application for a driver's certificate or if he or she was convicted of driving under the influence of alcohol or a controlled substance within 5 years immediately preceding the application. 52 Pa. Code §1021.4

158.   All medallion taxicabs are required to charge uniform rates, which must be just and reasonable, approved by the Authority, and posted in the passenger compartment of each vehicle. 53 Pa. C.S. §5703 and §5720

159.   In addition to the posting of the rates in the approved tariffs, medallion owners are also required to post Philadelphia street maps and a passenger bill of rights in the passenger compartment of their vehicles.

160.   Medallion taxicabs are prohibited from granting any unreasonable preference or advantage to any person or subjecting any person to any unreasonable prejudice or disadvantage concerning its rates. 53 Pa. C.S. §5703

161.   Medallion taxicab drivers are required to accept all forms of payment and may not demand any particular form of payment or a gratuity. 52 Pa. Code §1021.11

162.   A medallion taxicab may not operate without proof of primary commercial automobile liability insurance coverage approved by the Authority in amounts required under state law.  53 Pa. C.S. §5704

163.   Medallion taxicab drivers are required to transport any orderly person to any destination requested by the passenger and may not refuse service to any particular destination based on the racial or economic composition of the neighborhood.

164.   All of the foregoing standards are administered and enforced by the Authority.

### Non-compliance with Authority regulations pertaining to taxicabs in connection with Uber services arranged by Defendant Rasier

165.   Defendants Uber, Rasier, and Defendant Drivers, including other presently unknown drivers that provide Uber services arranged by Defendant Rasier, have not submitted themselves to regulatory oversight by the Authority, as they are required to do under the General Local Government Law, in connection with the offering, facilitation and provision of the Uber Services arranged by Defendant Raiser.

166.   Upon information and belief, Defendants Uber, Rasier, and Defendant Drivers, including other presently unknown drivers, are not in compliance with many of the Authority's regulations pertaining to taxicab service in Philadelphia that is arranged by Defendant Raiser.

167.   For both of these reasons, the Uber services arranged by Defendant Rasier that Defendants Uber, Rasier and the Defendant Drivers, including other presently unknown drivers, offer, facilitate and provide in Philadelphia is unlawful.

### Non-compliance with Authority regulations pertaining to taxicabs in connection with Uber services arranged by Defendant Gegen

168.   Defendants Uber, Gegen and other presently unknown drivers that provide Uber services arranged by Defendant Gegen, are not in compliance with many of the Authority's regulations pertaining to taxicab service in Philadelphia that is arranged by Defendant Raiser.

169.   Furthermore, Defendant Gegen is in violation of many of the Authority's regulations pertaining to limousine service with regard to:

(a)    The provision of unauthorized service in violation of the terms of its authorization to provide limousine service;

(b)    Charging of rates that are not based solely on time in increments of thirty minutes or more;

(c)    Fraudulent leasing arrangements;

(d)    Failing to adhere to its tariff on file with the Authority;

(e)    Failing to post its tariff;

(f)    Use of meters by a limousine carrier

(g)    Other regulatory provisions relating to limousine service;

170.   For both of these reasons, the Uber services arranged by Defendant Rasier that Defendants Uber, Rasier and the Defendant Drivers, including other presently unknown drivers, offer, facilitate and provide in Philadelphia is unlawful.

## COUNT I
## UNFAIR COMPETITION
## PLAINTIFFS v. DEFENDANTS, UBER, RAISER, GEGEN, DEFENDANT DRIVERS AND DEFENDANTS KALANICK AND FELDMAN

171.   Plaintiffs hereby incorporate by reference the averments in the foregoing paragraphs as if fully set forth herein at length.

### Overview of the regulatory scheme in Philadelphia

172.   Like many state legislatures, the Pennsylvania General Assembly has intervened into the competitive market for commercial transportation by enacting legislation that restricts competition between motor carriers in Pennsylvania and establishes rules for what constitutes fair competition between them.

173.   The legislation imposes significant restrictions on competition between motor carriers in four main areas:  (1) market entry, (2) rates, (3) vehicle, equipment and driver safety standards and (4) insurance requirements.

174.   The General Assembly enacted these restrictions not just to promote the health, safety and welfare of the public, but also to insure a stable, financially sound taxicab and limousine industry.

31

## Licensing requirements

175.   The General Assembly enacted legislation to restrict access to the market for commercial transportation by requiring all motor carriers to obtain a certificate of public convenience before beginning "to offer, render, furnish, or supply service" in Pennsylvania.  66 Pa. C.S. §1101 and 53 Pa. C.S. 5711

176.   This restriction enables regulators to ensure that every service provider meets certain minimum standards before beginning service and gives them the power to enforce ongoing compliance through the threat of suspension or revocation of operating rights.

177.   It also gives regulators the ability to control the number of service providers in the market to prevent destructive competition between carriers that degrades their ability to maintain high service standards.

178.   For these reasons, the provision of service by unauthorized service providers in a regulated market, also known as "gypsy cabs," undermines the entire regulatory scheme enacted by the General Assembly and diminishes the quality of service and the financial stability of the industry.

179.   Applications for certificates of public convenience are submitted to the Authority for authorization to provide taxicab service in Philadelphia and to the Commission for authorization to provide taxicab service everywhere else in the Commonwealth.

180. Applicants to the Commission must demonstrate that the granting of a certificate is "necessary or proper for the service, accommodation, convenience, or safety of the public." 66 Pa. C.S. §1103

181. Applicants to the Authority need only demonstrate that they are "capable of providing dependable taxicab service to the public according to the rules and regulations of the [A]uthority." 53 Pa. C.S. §5711(c)(1)

### The medallion taxicab system in Philadelphia

182. With regard to Philadelphia, the General Assembly has enacted special legislation that limits the number of taxicab licenses the Authority may issue for citywide taxicab service in Philadelphia and requires each certificate holder to own a corresponding taxicab medallion prior to beginning service.

183. The legislation was a legitimate exercise of the General Assembly's constitutional power to regulate behavior and enforce order for the betterment of the health, safety, and general welfare of Pennsylvania.

184. The legislation represents a policy choice by the General Assembly on the best way to ensure the availability of adequate taxicab service in Philadelphia and the financial stability of the taxicab industry, both of which are necessary to achieve the General Assembly's goal of a "clean, safe, reliable and well-regulated" taxicab industry. 53 Pa. C.S. §5701.1.

185.   Because it has chosen to enact a statutory limit on the number of taxicab licenses that may be issued in Philadelphia, the General Assembly has exclusive power to determine when, or if, this restriction should be modified to allow additional competitors into the market.

186.   Philadelphia taxicab service providers must acquire a taxicab medallion prior to beginning service in Philadelphia.  53 Pa. C.S. §5714(a)

187.   Medallions are property and may be pledged to lenders or creditors as security on debt and must be affixed to the hood of a vehicle when it is operating in Philadelphia as a taxicab.  53 Pa. C.S. §5713

188.   The value of a medallion is directly related to the limitation on the number of licenses that may be issued in Philadelphia and gives medallion taxicab operators the borrowing power necessary to maintain the high standards imposed upon them by regulation.

189.   The General Assembly established a closed market for medallions for this precise reason: to provide holders of certificates of public convenience which authorize citywide call or demand service the opportunity to upgrade and improve the operations of taxicabs.  53 Pa. C.S. §5712(a)

190.   Based on the foregoing, the provision of unauthorized taxicab service or the provision of taxicab service under a limousine license constitutes unfair competition as a matter of law.

191.   At all times relevant hereto, Defendants Uber, Gegen, Rasier and Defendant Drivers, as well as other presently unknown driver, acted by and through employees of Defendant Uber, acting within the course and scope of their employment with Defendant Uber, under the direction and supervision of Defendants Kalanick and Feldman.

192.   Defendants Uber, Gegen, Rasier, and Defendant Drivers as well as other presently unknown drivers have engaged and, are engaging in unlawful competition with Plaintiff Checker and the Medallion Taxicab Plaintiffs because they are offering, facilitating, and providing unauthorized taxicab service.

193.   Defendants Uber, Gegen, Rasier, and Defendant Drivers, as well as other presently unknown drivers have engaged, and are engaging in unlawful competition with Plaintiff Checker and the Medallion Taxicab Plaintiffs because they have not submitted themselves to regulatory oversight by the Authority, as they are required to do under the General Local Government Law, in connection with the offering, facilitation and provision of the Uber Services arranged by Defendant Raiser.

194.   Upon information and belief, Defendants Uber, Rasier, and Defendant Drivers, including other presently unknown drivers, have engaged, and continue to engage in unlawful competition with Plaintiff Checker and the Medallion Taxicab Plaintiffs because they have not complied, and are not complying with many of the

Authority's regulations pertaining to taxicab service in Philadelphia in connection with the Uber services that are arranged by Defendant Raiser.

195.   In addition, Defendants Uber, Gegen and presently unknown drivers have engaged, and are engaging in unlawful competition with Plaintiff Checker and the Medallion Taxicab Plaintiffs because they are offering, facilitating and providing taxicab service in violation of Defendant Gegen's authorization to provide limousine service.

196.   Furthermore, Defendants, Uber, Gegen and presently unknown drivers have engaged, and are engaging in unlawful competition with Plaintiff Checker and the Medallion Taxicab Plaintiffs because Defendant Gegen have violated, and continues to many of the Authority's regulations pertaining to limousine service with regard to:

(a)   The provision of unauthorized service in violation of the terms of its authorization to provide limousine service;

(b)   Charging of rates that are not based solely on time in increments of thirty minutes or more;

(c)   Fraudulent leasing arrangements;

(d)   Failing to adhere to its tariff on file with the Authority;

(e)   Failing to post its tariff;

(f)   Use of meters by a limousine carrier

(g)   Other regulatory provisions relating to limousine service;

197.   As a direct and proximate cause of the aforementioned unlawful competition by Defendants Uber, Raiser, Gegen, Defendant Drivers and other presently unknown drivers, as well as Defendants Kalanick and Feldman, Plaintiff Checker and the Medallion Taxicab Plaintiffs have suffered immediate and irreparable harm, and unless enjoined by the Court will continue to cause immediate and irreparable harm to Plaintiffs, for which there is no adequate remedy at law, and for which Plaintiffs are entitled to injunctive relief.

198.   As a further direct and proximate cause of unlawful competition of these Defendants, Plaintiffs have suffered, are suffering, and will continue to suffer damage to their businesses, reputation, and goodwill, and the loss of sales and profit Plaintiffs would have generated but for these Defendants' acts.

199.   The cost of acquiring a single medallion has recently been as high as $520,000.

200.   Based upon this valuation, the aggregate value of the medallions in Philadelphia has recently been as high as $880 million.

201.   As a direct and proximate result of the entry of the unlawful competition of these Defendants, the Medallion Taxicab Plaintiffs has suffered a significant reduction in the value of their medallions.

202.   These Defendants have acted in bad faith and have willfully engaged in unlawful acts and practices to avoid the costs and restrictions of lawful regulation, to injure Plaintiffs' businesses and to deceive the public.

203.   Thus, in addition to the injunctive relief sought herein, Plaintiffs are entitled to costs, including expert witness fees and attorney's fees pursuant to 25 U.S.C. §1117(a).

WHEREFORE, Plaintiffs pray for relief and judgment against all Defendants, as follows:

(1)   Compensatory and consequential damages to Plaintiffs' business and property, including but not limited to, lost or reduced fares and revenues owing to the acts and omissions of the Defendants;

(2)   An additional amount to be proven at trial for the substantial and irreparable loss of good will and business opportunity with consumers and customers suffered by Plaintiffs as a result of the acts and omissions of the Defendants;

(3)   Exemplary and/or punitive damages for the Defendants intentional, willful, wanton, and outrageous or malicious misconduct, characterized by their evil or rancorous motive, ill will, and intent to injure the Plaintiffs or the Defendants' gross recklessness or gross negligence evincing a conscious disregard for Plaintiffs' rights;

(4)   Equitable relief as might be appropriate, pursuant to applicable law, including but not limited to, enjoining Defendants from continuing their fraudulent scheme to provide unauthorized transportation service in Philadelphia and elsewhere in Pennsylvania;

(5)     Reasonable attorney's fees and costs, including costs of expert witness reports and testimony;

(6)     Any other and further relief as the Court deems just and proper.

## COUNT II
## VIOLATION OF SECTION 43(a) OF THE LANHAM ACT
## FALSE ADVERTISING

### PLAINTIFFS v. DEFENDANTS UBER AND FELDMAN

204.   Plaintiffs hereby incorporate by reference the averments in the foregoing paragraphs as if the same were fully set forth herein at length.

205.   On October 24, 2014, Defendants, Uber and Feldman posted an advertisement on its website and via a blast email to its account holders in the Greater Philadelphia Metropolitan Area, including Southeastern Pennsylvania, Southern New Jersey and Northern Delaware regarding the launch of UberX service in Philadelphia.  A true and correct copy of the email is attached hereto as Exhibit "B," and is incorporated herein by reference.

207.   On October 27, 2014, Defendants, Uber and Feldman, "tweeted" a similar advertisement on social media with a link to a post on its blog.  A true and correct copy of the aforementioned blog post is attached hereto as Exhibit "C," and is incorporated herein by reference.

208.   All of the foregoing communications constitute advertisements in interstate commerce within the meaning of Section 43(a) of the Lanham Act.

39

209.   All of the foregoing advertisements contain false and misleading statements that are literally false or literally true, but likely to mislead, confuse or deceive members of the riding public in a material way.

### False advertising of insurance status of Medallion Taxicab Plaintiffs

210.   The October 24, 2014, advertisement contained the following statement: "This week the largest taxi insurer went bankrupt, which means that as of 5:00 p.m. today, there is no guarantee that your taxicab will be insured."

211.   The October 27, 2014, tweet, which links to the blog post on Uber's website contains the following statement:

> In October, the largest taxi insurer in Pennsylvania went bankrupt. Many uninsured taxis are still on the road; though some may have new policies, **there's no guarantee that your taxi ride will be insured**.

(emphasis in the original)

212.   The statement refers to First Keystone Risk Retention Group ("First Keystone"), which insured many of the Taxicab Medallion Plaintiffs.

213.   On October 21 2014, the South Carolina Court of Common Pleas for the Fifth Judicial Circuit in Richland County, South Carolina, initiated liquidation proceedings against First Keystone.

214.   The South Carolina Court ordered, *inter alia*, that all existing policies of insurance be cancelled as **of November 20, 2014**, as a consequence of First Keystone's insolvency.

215.   On October 22, 2014, the Authority notified all First Keystone policyholders with proof of insurance on file with the Authority to obtain replacement insurance coverage by October 24, 2014, at 5:00 p.m., or risk being placed out-of-service by the Authority.

216.   Immediately upon receipt of the Authority's notice, all of the aforementioned First Keystone policy holders, including Medallion Taxicab Plaintiffs, initiated the process of obtaining replacement coverage by submitting applications for insurance and necessary supporting documents, including loss runs, to licensed insurance carriers authorized to provide insurance coverage in this Commonwealth.

217.   By October 24, 2014, almost all of the aforementioned First Keystone policyholders, including all of the Taxicab Medallion Plaintiffs, had obtained replacement insurance coverage and the rest were awaiting underwriting approval.

218.   In light of this development, the Authority elected not to place any of First Keystone policyholders out-of-service and extended the out-of-service deadline to October 27, 2014.

219.   By October 27, 2014, all of the Taxicab Medallion Plaintiffs had obtained replacement coverage and only a handful of other First Keystone policyholders had failed to obtain replacement coverage.

220.   No First Keystone policyholders were ever placed out of service and no medallion taxicabs operating in Philadelphia were ever uninsured as a consequence of the First Keystone liquidation because the First Keystone policies remained into effect until November 20, 2014, or the date of any replacement coverage.

221.   On the same day the first of the aforementioned advertisements were published, October 24, 2014, Raiser-PA, LLC ("Raiser-PA"), a wholly owned subsidiary of Defendant Uber, filed an Application for Emergency Temporary Authority with the Commission, seeking authorization to provide UberX service in Philadelphia and its surrounding counties.

222.   The Application was filed by means of interstate wires and by mail.

223.   In its application, Raiser-PA asserts that the initiation of liquidation proceedings against First Keystone was an emergency affecting public safety that required immediate action by the Commission to approve its Application for Emergency Temporary Authority.

224.   In its application, Raiser-PA certified that it was not currently engaged in unauthorized intrastate transportation for compensation between points in Pennsylvania and would not engage in such transportation unless and until such authorization was received from the Commission.

225.   This certification was false because Rasier-PA is the alter ego of Defendant Rasier or Defendant Uber, which has been actively engaged in providing unauthorized intrastate transportation in Pennsylvania and at the time the Application was filed had every intention of engaging in unauthorized intrastate transportation in Philadelphia, in fact, on the very day it filed the Application.

226.   The false certificate was in furtherance of the scheme of Defendant Uber to defraud regulators by attempting to obtain authorization under false pretenses.

227.   Based on the foregoing, the statement, "as of 5:00 p.m. today, there is no guarantee that your taxicab will be insured," is literally false.

228.   It was literally false because First Keystone insurance coverage was not cancelled as of 5:00 p.m. on October 24, 2014, it was cancelled as of November 20, 2014, or the date replacement coverage was secured, whichever was earlier.

229.   The Authority set a deadline of October 24, 2014, at 5:00 p.m. for First Keystone to get replacement coverage or be placed out of service and Defendants Uber and Feldman knew that this was the only significance for that date and time.

230.   Yet they intentionally mislead the public in stating that "as of 5:00 p.m. today, there is no guarantee that your taxicab will be insured."

43

231.   Likewise, the statement published in the tweet of October 17, 2014, stating that "many uninsured taxis are still on the road" was also literally false in that no taxicabs were ever uninsured and only a small number of taxicabs had not yet secured replacement coverage.

232.   Viewed in conjunction with the false and misleading application filed by Uber subsidiary, and alter ego, Rasier-PA, the statements in the advertisement clearly establish the intent to deceive not only the riding public but state regulators regarding the relative safety of competing taxicab services by disparaging First Keystone policyholders, including the Medallion Taxicab Plaintiffs.

233.   The false statements were designed to undermine consumer expectations regarding the insurance status of the Medallion Taxicab Plaintiffs and to discourage consumer from using their taxicab services and to use the unauthorized Uber services.

### Deceptive adverting of licensing status

234.   The advertisements also contain statements concerning the licensing status of UberX service in Philadelphia.

235.   The statement that UberX is "now available" in Philadelphia, while literally true, in that Defendants were offering UberX service in Philadelphia, is likely to mislead, confuse, and deceive the riding public into believing that the service was authorized by state regulators and could be provided legally.

44

**False advertising of UberX prices**

236.   In addition, the claim that UberX fares are 20% cheaper than a taxicab is literally false based on a comparison of the PPA-approved medallion taxicab tariff and UberX rates set forth above and when, especially with regard to the use of "surge pricing."

237.   The aforementioned false and misleading information disseminated by these Defendants Uber and Feldman constitute false and misleading advertising and are likely to mislead, and have misled, the riding public about the nature, characteristics and quality UberX service in comparison to Plaintiffs' taxicab service.

238.   These Defendants are willfully, knowingly and intentionally making false claims and descriptions in their advertising and, unless immediately enjoined by this Court, will continue to deceive, mislead, and confuse the riding public into believing that, among other things, Plaintiffs' taxicab service is inferior, less safe, risky, more expensive, and unsuitable for its intended purpose.

239.   This false and deceptive advertising is intended to cause members of the riding public to stop using Plaintiffs' taxicab service and to opt instead for Defendants' UberX and UberBlack service, which is unlawfully competing with Plaintiffs in the Philadelphia market without authorization.

240. As a direct and proximate cause of unlawful acts and practices of these Defendants, including those set forth above, these Defendants have caused, are causing, and, unless immediately enjoined by this Court, will continue to cause immediate and irreparable harm to Plaintiffs, for which there is no adequate remedy at law, and for which Plaintiffs are entitled to injunctive relief.

241. As a further direct and proximate cause of these Defendants' unlawful acts and practices, Plaintiffs have suffered, is suffering, and will continue to suffer damage to their businesses, reputation, and goodwill, and the loss of sales and profit Plaintiffs would have generated but for the acts of these Defendants.

242. These Defendants' actions, as described herein, are, and unless enjoined, will continue to be, in violation of Section 43(a) of the Lanham Act.

243. These Defendants have acted in bad faith and have willfully engaged in false advertising with the intent to injure Plaintiffs and deceive the riding public.

244. Thus, in addition to the injunctive relief sought herein, Plaintiffs are entitled to costs and attorney's fees pursuant to 25 U.S.C. §1117(a).

WHEREFORE, Plaintiffs pray for relief and judgment against Defendants, Uber and Feldman, as follows:

(1) Compensatory and consequential damages to Plaintiffs' business and property, including but not limited to, lost or reduced fares and revenues owing to the acts and omissions of the Defendants;

46

(2)    An additional amount to be proven at trial for the substantial and irreparable loss of good will and business opportunity with consumers and customers suffered by Plaintiffs as a result of the acts and omissions of the Defendants;

(3)    Exemplary and/or punitive damages for the Defendants intentional, willful, wanton, and outrageous or malicious misconduct, characterized by their evil or rancorous motive, ill will, and intent to injure the Plaintiffs or the Defendants' gross recklessness or gross negligence evincing a conscious disregard for Plaintiffs' rights;

(4)    Equitable relief as might be appropriate, pursuant to applicable law, including but not limited to, enjoining Defendants from continuing their fraudulent scheme to provide unauthorized transportation service in Philadelphia and elsewhere in Pennsylvania;

(5)    Reasonable attorney's fees and costs, including costs of expert witness reports and testimony;

(6)    Any other and further relief as the Court deems just and proper.

## COUNT III
### Violation of 18 U.S.C. §1962(c)
### Plaintiffs v. Defendants, Uber, Kalanick, Raiser, Gegen, Feldman, Google, and Defendant Drivers

245.   Plaintiffs hereby incorporate by reference the averments contained in the foregoing paragraphs as if the same were fully set forth herein at length.

246.   Each of the Plaintiffs is a "person" under 18 U.S.C. §1961(3) and §1964(c).

247.   Each of the Defendants is a "person" under 18 U.S.C. §1961(3) and §1962(c).

248.  The individual Defendants and Defendants are "persons" under 18 U.S.C. §1961(3) and 1962(c).

249.  The Illegal Taxicab Enterprise of Defendants, described below, constitutes an "enterprise" within the meaning of 18 U.S.C. §1961(4) and §1962(c), which "enterprise" was engaged in activities affecting interstate commerce at all times relevant to this complaint.

250.  Defendants, Uber, Kalanick, Feldman, Rasier, Gegen, and Defendant Drivers were, and are, associated with the Illegal Taxicab Enterprise and have conducted or participated, directly or indirectly, in the management and operation of the affairs of the Illegal Taxicab Enterprise in relationship to the Plaintiffs through a pattern of activity unlawful under 18 U.C.S. §1961(a), to wit:  multiple, repeated violations of 18 U.S.C. §1343 (pertaining to wire fraud).

251.  As more fully described below, Defendants have conducted and participated in, and are conducting and participating in, a fraudulent and illegal scheme to violate and evade Pennsylvania motor carrier laws and regulations, by launching, offering, facilitating and providing the Uber services in Philadelphia, without obtaining authorization for, or submitting themselves to, regulatory oversight by state regulators.

252.  As more fully described below, Defendants, Gegen and Kalanick, have conducted and participated in a fraudulent and illegal scheme to evade

taxicab regulations, by filing false and misleading applications for authority and other documents that conceal their intention to offer, facilitate and provide unauthorized taxicab service in Philadelphia using the Uber technology platform.

253.   As more fully described below, the Illegal Taxicab Enterprise has the common purpose of obtaining illegal revenues through the collection of unlawful taxicab fares from the riding public, by means of the aforementioned fraudulent schemes, through a "pattern of racketeering activity" within the meaning of 18 U.S.C. §1961(1) and (5).

254.   As more fully described below, the "racketeering activity" of Defendants Uber, Kalanick, Feldman, the Uber Subsidiaries, and the Uber Drivers, consists of multiple, repeated, and continuous violations of 18 U.S.C. §1343 (pertaining to wire fraud).

### Predicate acts of racketeering

255.   Defendants Uber, Kalanick, Feldman, the Uber Subsidiaries, and the Uber Drivers, have committed, and continue to commit, multiple, repeated, and continuous acts of wire fraud in violation of 18 U.S.C. §1343.

256.   These Defendants commit wire fraud to further their illegal scheme to defraud the riding public, by offering, facilitating and providing the Uber services without authorization and by collecting unlawful fares for unauthorized taxicab service in Philadelphia.

257.   The Uber technology platform has used and continues to use interstate wires.

258.   When Defendant drivers and other presently unknown drivers log on to the Uber technology platform to provide the unlawful Uber services, they connect to the Uber website on servers in other states via the Internet with radio and wire transmissions.

259.   In addition, when Uber customers use credit card transactions to pay unlawful fares for unauthorized taxicab service, they use the Uber technology platform, which connects them to the technology platforms of various financial institutions with servers in other states via the Internet with radio and wire transmissions.

260.   Each time the Uber technology platform processes a credit card payment for an unlawful fare for unauthorized taxicab service in Philadelphia, the above Defendants are committing a separate act of wire fraud in violation of 18 U.S.C. §1343.

261.   The above Defendants committed the following specific acts of wire fraud in violation of 18 U.S.C. §1343:

(a)   On October 25, 2014, the above Defendants used interstate wire transmissions through the Uber technology platform to offer, facilitate and provide UberX service, when Defendant Khmil transported one or more individuals from the 4000 block of Woodhaven Road to the 200 Block of Dock Street in Philadelphia in a private passenger vehicle owned by him, and

50