# IN THE FEDERAL DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| CHECKER CAB PHILADELPHIA, INC., : | | |
| t/a 215-GET-A-CAB, *et al.* : | | |
| : | 2:14-cv-07265-NIQA | |
| PLAINTIFFS : | | |
| v. : | | |
| : | | |
| UBER TECHNOLOGIES, INC., *et al.* : | | |
| : | | |
| DEFENDANTS : | | |

**PLAINTIFF'S JOINT MEMORANDUM IN OPPOSITION
TO MOTIONS TO DISMISS
OF DEFENDANTS UBER TECHNOLOGIES, INC., GEGEN, LLC
RASIER, LLC, TRAVIS KALANICK, AND JON FELDMAN and
UBER DRIVERS**

Plaintiffs, through their undersigned counsel, Salaman, Grayson, & Henry, P.C., respectfully submit this Memorandum of Law in Opposition to Defendants' Motions to Dismiss.

## I.    INTRODUCTION

This memorandum of law in opposition to above-named Defendants' Motions to Dismiss responds jointly to the arguments raised in their separate motions and memoranda.  In addition, Plaintiffs have also filed this date a brief in response to the Motion of Defendant Google Ventures, LLC ("Google").  To the extent Googles raises arguments in support of their Motion that are substantially

similar to the arguments the Uber Defendants raise in their Motions, Plaintiff hereby incorporates the arguments set forth in its Memorandum in opposition to Google's motion to dismiss.

## II.   ARGUMENT

### a.  Standard for Motions to Dismiss

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint, in whole or in part, for failure to state a claim upon which relief can be granted. See Fed.R.Civ.P. 12(b)(6). In considering a Rule 12(b)(6) motion, the Court's role is limited to determining whether a plaintiff is entitled to offer evidence in support of his or her claims. *See* Semerenko v. Cendant Corp., 223 F.3d 165, 173 (3d Cir.2000). The Court does not consider whether a plaintiff will ultimately prevail. *See id*. A defendant bears the burden of establishing that a plaintiff's complaint fails to state a claim. *See* Gould Elecs. v. United States, 220 F.3d 169, 178 (3d Cir.2000).

"A pleading that states a claim for relief must contain ... a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a). The statement required by Rule 8(a)(2) must give the defendant fair notice of what the ... claim is and the grounds upon which it rests. Erickson v. Pardus, 551 U.S. 89, 93, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (per curiam) (*quoting* Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929

(2007)). Detailed factual allegations are not required. Twombly, 550 U.S. at 555, 127 S.Ct. 1955. However, mere conclusory statements will not do; "a complaint must do more than allege the plaintiff's entitlement to relief." Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir.2009).  Instead, a complaint must "show" this entitlement by alleging sufficient facts. Id. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 1950, 173 L.Ed.2d 868 (2009). As such, "[t]he touchstone of the pleading standard is plausibility." Bistrian v. Levi, 696 F.3d 352, 365 (3d Cir.2012).

The inquiry at the motion to dismiss stage is "normally broken into three parts: (1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged." Malleus v. George, 641 F.3d 560, 563 (3d Cir.2011).

Dismissal is appropriate only if, accepting as true all the facts alleged in the complaint, a plaintiff has not pleaded "enough facts to state a claim to relief that is plausible on its face," Twombly, 550 U.S. at 570, 127 S.Ct. 1955, meaning enough factual allegations " 'to raise a reasonable expectation that discovery will reveal evidence of' " each necessary element. Phillips v. County of Allegheny, 515 F.3d

224, 234 (3d Cir.2008) (*quoting* <u>Twombly</u>, 550 U.S. at 556, 127 S.Ct. 1955). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." <u>Iqbal</u>, 556 U.S. at 678, 129 S.Ct. 1937. "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Id. at 679, 129 S.Ct. 1937, 1950.

In deciding a motion to dismiss, the Court should consider the allegations in the complaint, exhibits attached to the complaint, and matters of public record. *See* <u>Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.</u>, 998 F.2d 1192, 1196 (3d Cir.1993).  The Court may also consider "undisputedly authentic" documents when the plaintiff's claims are based on the documents and the defendant has attached copies of the documents to the motion to dismiss. Id. The Court need not assume the plaintiff can prove facts that were not alleged in the complaint, *see* <u>City of Pittsburgh v. W. Penn Power Co.</u>, 147 F.3d 256, 263 & n. 13 (3d Cir.1998), or credit a complaint's " 'bald assertions' " or " 'legal conclusions.' " <u>Morse v. Lower Merion Sch. Dist.</u>, 132 F.3d 902, 906 (3d Cir.1997) (*quoting* <u>In re Burlington Coat Factory Sec. Litig.</u>, 114 F.3d 1410, 1429–30 (3d Cir.1997)).

> **b. Plaintiffs' claims are properly before the Court for resolution and are not best left to the state legislature or the state agencies charged with administering and enforcing state law.**

In their motion to dismiss, Defendants first assert that Plaintiffs' claims are not properly before the Court because they rely on violations of "local taxicab regulations."  As an initial point of clarification, it should be noted that there are no "local taxicab regulations" at issue in the present matter.  Taxicab service in Pennsylvania is governed by state statutes enacted by the Pennsylvania General Assembly and administered and enforced by two state agencies.  These statutes also govern other types of motor carrier service, but only taxicabs are permitted to provide "call or demand" service, also described herein as "on demand passenger service."[1]  53 Pa. C.S. §5701

By way of background, the state statutory laws at issue here are the Public Utility Code, 66 Pa. C.S. §§ 101, et seq., and Chapter 57 of the General Local Government Code, 53 Pa. C.S. §§ 5701-5745, as amended.  The state agencies that administer and enforce these state statutes are the Public Utility Commission ("Commission") and the Philadelphia Parking Authority ("Authority").  *See* Blount v. Philadelphia Parking Authority, 965 A.2d 226 (Pa. 2009) (holding that the Authority is a state agency for the purpose of regulating taxicab and limousine service in Philadelphia)

---

[1]  53 Pa. C.S. §5701 defines "call or demand service" or "taxicab service" as follows:  "Local common carrier service for passengers, rendered on either an exclusive or nonexclusive basis, where the service is characterized by the fact that passengers normally hire the vehicle and its driver either by telephone call or by hail, or both. The term does not include limousine service."

Taxicabs that are licensed to provide call or demand passenger service on a citywide basis within Philadelphia are known as "medallion" taxicabs because they have medal medallions affixed to their hoods.  53 Pa. C.S. §5714(a).  A medallion is a property right, similar to a patent, trademark, or copyright, because it grants its owner an exclusive franchise to provide on demand passenger service on a citywide basis in Philadelphia.  53 Pa. C.S. §5712  A medallion must be purchased or acquired in the private market before one may seek a license, called a certificate of public convenience, to provide such service in Philadelphia.  53 Pa. C.S. §5711 and §5712  It is unlawful to provide on demand transportation service in Philadelphia without a medallion and a certificate of public convenience.  53 Pa. C.S. §5714(f)

Defendants cannot reasonably dispute the fact that they are providing on demand motor carrier passenger service to the public or that they need to obtain both a medallion and a certificate of public convenience from the Authority before offering, facilitating or providing UberX service in Philadelphia.[2]   First, Defendants promote the transportation services they offer as on demand passenger service on their own website.  *See e.g.* https://www.uber.com/ ("Your Ride, On Demand")  Secondly, Defendants have, on a number of occasions, applied to both

---

[2]  UberX is defendants' low-cost on demand passenger service provided by individuals driving their own private passenger vehicles.

the PUC and the PPA for advance agency approval before beginning to offer, facilitate, and provide services other than UberX.[3]   Third, in an attempt to circumvent the requirement of obtaining medallions, Defendant Uber, through one of its subsidiaries, attempted to obtain authorization from the PUC to provide UberX service on an experimental basis throughout Pennsylvania, *including Philadelphia*.  By doing so, Defendants acknowledged that there was a need for advance agency authorization prior to beginning UberX service in Philadelphia.

In granting the application for experimental service, the Commission explicitly ruled that it had jurisdiction to consider the application for authorization to provide UberX service, stating:  "There is no legitimate question that Rasier-PA, utilizing the Uber software and back office functions, is offering and operating 'on demand' motor carrier passenger service to the public."  Application of Rasier-PA, LLC, PUC Docket No. A-2014-2424608 at p.20 (November 13, 2014) (copy attached)  But the Commission declined to grant the application to the extent it requested authorization to provide UberX service in Philadelphia, emphasizing that its order "does *not* authorize Rasier-PA to provide experimental service originating

---

[3]  See e.g. Application of Gegen, LLC, PUC Docket No. A-2012-2317300 (PUC Order dated January 24, 2013, granting authorization to act as a broker of transportation services for passengers); See also, Application of Gegen, LLC, PUC Docket No. A- A-2012-2339043 (PUC Order dated August 15, 2013, granting authorization to provide limousine service in Bucks, Chester, Delaware, and Montgomery counties, to points in Pennsylvania, and return; excluding areas under the jurisdiction of the Philadelphia Parking Authority.); See also, Application of Gegen, LLC, PPA Docket No. 1029638-07 (authorizing provision of luxury limousine service in Philadelphia)

or terminating at points in the City of Philadelphia." <u>Rasier-PA</u> at n. 25, p. 73 (emphasis in the orginial)  The Commission determined that such a ruling "would directly conflict with the jurisdiction of the Philadelphia Parking Authority pursuant to 53 Pa. C.S. §§ 5701, *et seq*." *Id.*

Based on its own conduct and the PUC's ruling, Defendants clearly knew that they have to obtain medallions and advance authorization from the Authority prior to beginning to offer, facilitate and provide UberX service in Philadelphia.  Yet, they chose instead to launch the service without first obtaining medallions or certificates in violation of 53 Pa. C.S.. §5714(a).  Given their history in Pennsylvania, it borders on the absurd for Defendants to continue claiming that Plaintiffs are attempting to manufacture a private right of action by claiming that its business is unlawful.

In denying Plaintiffs' Motion for Preliminary Injunction, this Court stated:

> [T]his Court finds that these issues are best left to the state and local legislative bodies and regulatory authorities charged with implementing and enforcing the ordinances and regulations that Plaintiffs seek to enforce by way of private litigation.  Though this Court does not intend this ruling to also dispose of the merits of Plaintiffs' claims in their entirety at this stage, Plaintiffs, however, have fallen far short of demonstrating a likelihood of success on the merits on their unfair competition claim as needed to obtain a preliminary injunction under Rule 65.

Defendants now rely on this holding to argue that Plaintiffs' claims should also be dismissed to the extent that they rely on violations of statutory law.  Plaintiffs assert that the Court's prior holding is fundamentally flawed for three reasons.

First, the Court's holding is erroneous to the extent it finds that the issues presented here are best left to local legislative bodies and regulatory agencies charged with implementing and enforcing the "ordinances and regulations that Plaintiffs seek to enforce by way of private litigation."  As noted above, this case does not involve local ordinances or regulations enacted by local legislative bodies and administered and enforced by local regulatory agencies.  It involves state statutes enacted by the Pennsylvania General Assembly and administered and enforced by state regulatory agencies.

In their memorandum in opposition to preliminary injunction, Defendants make reference to Philadelphia City Council's passage of a non-binding resolution supporting Defendants entry into the Philadelphia market.  But City Council has no jurisdiction over the issues presented here.  It has no power to enact ordinances or to adopt regulations pertaining to taxicab service in Philadelphia.  City Council's support for Defendants is purely political and should have no bearing on the outcome of the present action.

Second, the Court's holding is erroneous to the extent it finds that the issues presented here are best left to state legislative bodies.  As noted above, the Pennsylvania General Assembly *has spoken* with regard to these issues by enacting statutes to govern the regulation of on demand passenger service in Philadelphia. These statutes created the property rights at issue here, medallions, which confer a

franchise, exclusive to each medallion owner, to provide such service in Philadelphia.  Plaintiffs purchased these franchise rights at considerable expense and continue incur significant costs in maintaining them for the benefit of the riding public.  Defendants are infringing on these rights by providing such service without authorization.

Plaintiffs cannot seek vindication of these statutorily-created property rights from the state legislature.  Such relief may only be granted by a court of competent jurisdiction upon a proper cause of action.  In their memorandum in opposition to preliminary injunction, Defendants make reference to a bill pending before the state legislature that would relieve them from the legal obligations existing law imposes on them.  But it is inappropriate for this Court to speculate on the impact future legislation might have on the claims presented here, even if the Court thinks it best to do so.

Rather, in considering Plaintiffs' claims, this Court is duty-bound, where appropriate, to apply the substantive law of Pennsylvania, both common law and statutory law, *as enacted*.  *See* Erie R. Co. v. Tompkins, 304 U.S. 64, 78, 58 S.Ct. 817, 822 (1938)  It is not appropriate for this Court to deny relief based on the Court's opinion that legislative changes are necessary, desirable or even imminent.

To do so, is an invasion of the authority of the state and a denial of its independence.[4]

Third, and most importantly, the Court's holding is erroneous to the extent it finds that the issues raised in Plaintiffs' claims are best handled by the regulatory agency charged with implementing and enforcing the laws and regulations governing taxicab operations in Philadelphia.  In cases where judicial enforcement

---

[4]  As Justice Brandeis stated in Erie:

> Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state. And whether the law of the state shall be declared by its Legislature in a statute or by its highest court in a decision is not a matter of federal concern. There is no federal general common law. Congress has no power to declare substantive rules of common law applicable in a state whether they be local in their nature or 'general,' be they commercial law or a part of the law of torts. And no clause in the Constitution purports to confer such a power upon the federal courts. As stated by Mr. Justice Field when protesting in Baltimore & Ohio R.R. Co. v. Baugh, 149 U.S. 368, 401, 13 S.Ct. 914, 927, 37 L.Ed. 772, against ignoring the Ohio common law of fellow-servant liability: I am aware that what has been termed the general law of the country—which is often little less than what the judge advancing the doctrine thinks at the time should be the general law on a particular subject—has been often advanced in judicial opinions of this court to control a conflicting law of a state. I admit that learned judges have fallen into the habit of repeating this doctrine as a convenient mode of brushing aside the law of a state in conflict with their views. And I confess that, moved and governed by the authority of the great names of those judges, I have, myself, in many instances, unhesitatingly and confidently, but I think now erroneously, repeated the same doctrine. But, notwithstanding the great names which may be cited in favor of the doctrine, and notwithstanding the frequency with which the doctrine has been reiterated, there stands, as a perpetual protest against its repetition, the constitution of the United States, which recognizes and preserves the autonomy and independence of the states,—independence in their legislative and independence in their judicial departments. Supervision over either the legislative or the judicial action of the states is in no case permissible except as to matters by the constitution specifically authorized or delegated to the United States. Any interference with either, except as thus permitted, is an invasion of the authority of the state, and, to that extent, a denial of its independence.'

Erie R. Co. v. Tompkins, 304 U.S. 64, 78-79, 58 S. Ct. 817, 822-23, 82 L. Ed. 1188 (1938)

of a claim requires the resolution of issues which, under a particular regulatory scheme, have been placed within the special competence of an administrative body, the doctrine of primary jurisdiction may apply and require the court to refer all or part of the dispute to the agency for disposition.  United States v. Western Pacific Railroad Company, 352 U.S. 59, 64, 77 S.Ct. 161, 1 L.Ed. 126 (1956)

In the present case, the Court failed to apply the doctrine of primary jurisdiction under Pennsylvania law, as it applies to the PPA and PUC, and did not make a specific finding whether the present controversy implicates the special competence of these agencies or whether some or all of the issues presented should be referred to them for disposition, while the Court retains subject matter jurisdiction.[5]

As noted, the doctrine of primary jurisdiction, as it relates to the PUC and PPA, is part of the substantive law of Pennsylvania, law which the court is bound

---

[5]  The doctrine of primary jurisdiction is to be distinguished from the concept of federal subject matter jurisdiction.  *See* Reiter v. Cooper, 507 U.S. 258, ⸺, 113 S.Ct. 1213, 1220, 122 L.Ed.2d 604 (1993) ("Referral of the issue to the administrative agency does not deprive the court of jurisdiction.")  A state legislature may limit the jurisdiction of its own state's courts by enacting a statute vesting exclusive primary jurisdiction in a state board or agency.  Teleconcepts at 1109 (Nygaard, *concurring*) (*citations omitted*)  It does not follow, however, that a *state* may by statutory or decisional law restrict the subject matter jurisdiction of the *federal* courts.  Id.  A district court with subject matter jurisdiction may refrain from exercising it under the doctrine of primary jurisdiction pending a decision in the proceedings before an agency with exclusive primary jurisdiction, such as the PUC. Id. (citations omitted)  This is so, not because the exclusive primary jurisdiction of the PUC deprived the district court of subject matter jurisdiction, but because the PUC's exclusive primary jurisdiction is part of the substantive law of Pennsylvania, law which the court is bound to apply under the *Erie* doctrine. Id. at 1110

to apply under the Erie doctrine.  See Edelson v. Soricelli, 610 F.2d 131, 135 (3d Cir. 1979)  In the present case, the Court relied on Sandoz Pharmaceuticals Corp. v. Richardson-Vicks, Inc., 902 F.2d 222 (3d Cir. 1990), and Dial A Car, Inc. v. Transportation, Inc., 82 F.3d 484 (D.C. Cir. 1996), neither of which applied the doctrine of primary jurisdiction under Pennsylvania law as it applies to the PPA and PUC.  Accordingly, Sandoz and Dial A Car and not binding with regard to the whether the PPA or the PUC has primary jurisdiction over any issue presented by Plaintiffs in their complaint.  Furthermore, these cases have limited persuasive value because they did not apply Pennsylvania law or deal with issues pertaining to the regulation of on demand passenger service in Philadelphia.

As the Commonwealth Court held in Virgilli v. Southwestern Pennsylvania Water Authority, 427 A.2d 1251, 1253 (Cmnwlth. Ct. 1981), "[a]lthough the public utility law grants to the commission general supervisory and regulatory power over public utilities, . . . the code does not confer an exclusive jurisdiction to decide all matters involving regulated public utilities.  On the contrary, except as otherwise expressly provided in the code, the commission's powers and duties do not 'abridge or alter the existing rights of action or remedies in equity or under common or statutory law of this Commonwealth."  Id. (citations omitted)

In  MCI Telecommunications Corp. v. Teleconcepts, Inc., 71 F.3d 1086 (3d Cir. 1995), the Third Circuit noted that, in cases involving the regulation of public

utilities in Pennsylvania, courts routinely look to two Pennsylvania Supreme Court cases to determine whether a particular controversy implicates the special competence of the PUC:  Elkin v. Bell Telephone Co. of Pennsylvania, 420 A.2d 371 (Pa. 1980) and DeFrancesco v. Western Pennsylvania Water Co., 453 A.2d 595 (Pa. 1982). *Id*. at 1104 (citations omitted)

In Elkin, the Pennsylvania Supreme Court held that allegations that a telephone utility negligently failed to furnish a consumer with "reasonable rapid and efficient service" fell within the PUC's area of expertise because the claim involved the general reasonableness, adequacy and sufficiency of the utility's service.  *Id*. at 373.  The plaintiff in Elkin, relying on the Pennsylvania Supreme Court's decision in Feingold v. Bell of Pennsylvania, 383 A.2d 791 (Pa. 1977), had argued that the trial court had exclusive jurisdiction over damage claims against public utilities.  Noting that Feingold dealt mainly with the absence of an adequate administrative remedies, the Elkin court rejected this argument as too broad, finding that it "ignore[d] the reality that frequently *both* the courts and administrative agencies must each play roles in the adjudication of certain matters." *Id.* at 375 (emphasis in original)

To address such circumstances, courts developed the doctrine of primary jurisdiction. *Id.* at 376.  As described generally in Elkin*,* the doctrine of primary jurisdiction permits the bifurcation of a plaintiff's claim, whereby a trial court,

faced with a claim requiring the resolution of an issue that is within the expertise of an administrative agency, will first cede the analysis of the issue or issues to that agency. *Id*.  Once the agency resolves the particular issue or issues over which it has primary jurisdiction, the trial court may proceed, if necessary, to apply the agency's decision to the dispute remaining before the trial court. Id.

The doctrine "creates a workable relationship between the courts and administrative agencies wherein, in appropriate circumstances, the courts can have the benefit of the agency's views on issues within the agency's competence." *Id.* at 376.  As the Elkin court explained:

> The doctrine serves several purposes, chief of which are the benefits to be derived by making use of the agency's special expertise in complex areas with which judges and juries have little familiarity. Another important consideration is the statutory purpose in the creation of the agency—the powers granted by the legislature and the powers withheld. And, another fundamental concern is the need to promote consistency and uniformity in certain areas of administrative policy. It has been noted that these purposes are frequently served in, and the doctrine of primary jurisdiction principally applicable to, the controversies concerning the so-called "regulated industries."

> *Id.* at 376 (citations omitted).

When a trial court calls upon an administrative agency to exercise its primary jurisdiction and evaluate a particular pertinent issue, and the agency renders a determination, that adjudicatory action has a binding, collateral effect upon the trial court's proceedings, unless a party successfully challenges the

determination through the appeal process. *Id.* Such determinations by administrative agencies, therefore, serve more than a merely advisory function. *Id.*

By contrast, in <u>DeFrancesco</u>, the Pennsylvania Supreme Court held that allegations that a water utility negligently failed to maintain proper water pressure causing fire damage to plaintiff's property did not fall within the PUC's expertise and thus its primary jurisdiction. The Court reasoned:

> The controversy now before us ... is not one in which the general reasonableness, adequacy or sufficiency of a public utility's service is drawn into question. Resolution of appellant's claims depended upon no rule or regulation predicated on the peculiar expertise of the PUC, no agency policy, no question of service or facilities owed the general public, and no particular standard of safety or convenience articulated by the PUC.... Rather,.... [r]esolving the essential question of whether the utility failed to perform its mandated duties requires no recondite knowledge or experience and falls within the scope of the ordinary business of our courts.

DeFrancesco at 378

Similarly, in <u>Elkin</u>, the Supreme Court held that, where a matter is not one peculiarly within the agency's area of expertise, but is one which the courts or jury are equally well-suited to determine, the court must not abdicate its responsibility, finding that, in such cases, it would be wasteful to employ the bifurcated procedure of referral, as no appreciable benefits would be forthcoming. *Id.* at 377 (footnote omitted).

As a threshold matter, there is little need for this Court to refer to the regulatory agencies the issue of whether Defendants are providing unauthorized

service in violation of the statute because there is little doubt as to where the agencies stand on this issue. As noted above, the PUC has explicitly ruled that "[t]here is no legitimate question that Rasier-PA, utilizing the Uber software and back office functions, is offering and operating 'on demand' motor carrier passenger service to the public." Application of Rasier-PA, p. 20  Defendants have conceded as much by applying for such authorization when it did not require the purchase of a medallion.  The PUC also determined in its opinion and order that Defendants' request for authorization to provide UberX service in Philadelphia is subject to the jurisdiction of the PPA.

As to the PPA's position, Plaintiffs have alleged in their complaint that the PPA has seized numerous vehicles and issued numerous citations to drivers unlawfully providing UberX service in Philadelphia.  See Plaintiffs' Complaint, Introduction and ¶ 255-262.  Numerous news reports also corroborate Plaintiffs' claims regarding the PPA's position that UberX service is unlawful.[6]  Indeed, if

---

[6]  *See*  Victor Fiorello, *Uber Helping PPA Bust UberX Drivers*, Philadelphia Magazine (March 2, 2015), http://www.phillymag.com/news/2015/03/02/uberx-legal-philadelphia-ppa/

*See also* Paul Nussbaum and Claudia Vargas, *Phila. Crackdown on UberX continues; ride share firm vows to go on*, Philadelphia Inquirer (October 28, 2014), http://articles.philly.com/2014-10-28/business/55525955_1_uber-black-uberx-uber-spokesman-taylor-bennett

See *also* Vince Lattanzio, *UberX Drivers Could Face Arrest and Legal Fines for Operating in Phialdelphia*, NBC10 News (November 10, 2014), http://www.nbcphiladelphia.com/news/local/UberX-Drivers-Could-Face-Arrest-for-Operating-in-Philadelphia-282062051.html

Defendants were not obligated to purchase medallions and seek advance authorization from the PPA to provide UberX service in Philadelphia, it would not now be lobbying the General Assembly to change existing law to relieve them from these obligations.

Secondly, by establishing that it is a criminal offense to operate an unauthorized vehicle as a taxicab, or to give the appearance of offering call or demand service with an unauthorized vehicle, without first having received a certificate of public convenience and a medallion, the General Assembly has explicitly vested trial courts and juries with concurrent jurisdiction to make this determination in the context of criminal prosecutions.

Furthermore, the statutes empower the PPA to impose civil penalties for violations of the statute, as well as for the failure to comply "with any final judgment, order or decree made by any court."  53 Pa. C.S. §5725  Clearly, the Pennsylvania General Assembly intended courts to have concurrent jurisdiction with the PPA to decide issues like the one presented here relating to the provision of unauthorized service.

For all of the foregoing reasons, the Court erred when it failed to apply the doctrine of primary jurisdiction under Pennsylvania law to the issues presented in Plaintiffs' complaint and determined that these issues are best left to the PPA and

the PUC.   Determining whether the provision of UberX service without a medallion or a certificate of public convenience is unlawful is not a matter within the peculiar expertise of either the PPA or the PUC.   Rather, it involves a simple matter of statutory construction and application of the clear and unambiguous language of the statute to facts that are hardly in dispute.   Referral of these issues to the appropriate agency is not necessary because the position of the agencies is clear.   In the alternative, if the Court determines that it is not just as well suited as the PPA to determine the issues presented here and that final adjudication of the merits of pending PPA's prosecutions against Defendants is necessary, then the Court should suspend this action temporarily until the PPA has the opportunity to enter final orders disposing of this issue before proceeding further with Plaintiffs' claims.   In any event, dismissal of Plaintiffs' claims is not warranted for the reason that these issues are best left to the PPA.

### c. Plaintiffs have pleaded a plausible claim for unfair competition under Pennsylvania common law based on a violation of Section 5714(a) of the General Local Government Code

In its order denying Plaintiffs' Motion for Reconsideration, dated March 27, 2015, the Court stated that Plaintiffs had asserted new legal theories that could have and should have been raised in its original motion for preliminary injunction. To the extent that the Court did not have an opportunity to consider these

arguments because they were not properly raised by Plaintiffs, they are presented for the Court's consideration here in response to Defendants' Motion to Dismiss.

The elements of Pennsylvania's common law tort of unfair competition are separate and distinct from Lanham Act liability. A claim of unfair competition under Pennsylvania common law includes a broad range of unfair practices. *See* 18A Summ. Pa. Jur. 2d Commercial Law § 19:2 (2d ed.). While Pennsylvania common law traditionally defines unfair competition as the "passing off" of a rival's goods as one's own, creating confusion between one's own goods and the goods of one's rival, the doctrine of unfair competition in Pennsylvania is not restricted to passing off. Granite State Ins. Co. v. Aamco Transmissions, Inc., 57 F.3d 316, 319 (3d Cir.1995) (citing Carl A. Colteryahn Dairy, Inc. v. Schneider Dairy, 203 A.2d 469, 473 (Pa. 1964)).

In Giordano v. Claudio, 714 F. Supp. 2d 508 (E.D. Pa. 2010), the Eastern District Court recognized that the Pennsylvania common law tort of unfair competition is coextensive with the definition set forth in the Restatement (Third) of Unfair Competition. Id. at (*citing* Bldg. Materials Corp. of Am. v. Rotter, 535 F.Supp.2d 518, 526 n. 4 (E.D.Pa.2008) (citing Babiarz v. Bell Atl.-Pa., Inc., No.2000–1863, 2001 WL 1808554, at *9 (Pa.Com.Pl. Jul. 10, 2001); and Lakeview Ambulance & Med. Servs., Inc. v. Gold Cross Ambulance & Med. Serv., Inc., No.1994–2166, 1995 WL 842000, at *1–*2 (Pa.Com.Pl. Oct. 18,

1995)); <u>ID Sec. Sys. Canada, Inc. v. Checkpoint Sys., Inc.</u>, 249 F.Supp.2d 622, 688

(E.D.Pa.2003); <u>Yeager's Fuel, Inc. v. Pa. Power & Light Co.</u>, 953 F.Supp. 617, 668

(E.D.Pa.1997).

In its memorandum opposing Plaintiffs' motion for preliminary injunction,

Defendants relied a number of cases holding that unfair competition claims under

Pennsylvania common law are equivalent unfair competition claims under Lanham

Act claims involve unfair competition claims under the Lanham Act as well.[7]  But

Plaintiffs' unfair competition claim does not involve the Lanham Act.

Accordingly, the cases cited by Defendants and relied upon by the Court are

inapposite.

The Lanham Act codified the common law claim of trademark infringement

and the related claim of unfair competition.   Plaintiffs acknowledge that courts

have uniformly recognized that these claims are identical, whether asserted under

the Lanham Act or the common law, with the exception of the interstate commerce

element.   But that is not to say that the Lanham Act codified the full panoply of

---

[7]  <u>Flynn v. Health Advocate, Inc.</u>, 169 F. App'x 99 (3d Cir. 2006) (false designation of origin
under the Lanham Act, common law trademark infringement, and unfair competition); <u>Fisons
Horticulture, Inc. v. Vigoro Indus., Inc.</u>, 30 F.3d 466 (3d Cir. 1994) (trademark infringement and
unfair competition under the Lanham Act, infringement of a common law trademark, common
law unfair competition, and violation of the Delaware Deceptive Trade Practices Act); <u>Inwood
Labs., Inc. v. Ives Labs., Inc.</u>, 456 U.S. 844 (1982) (Sections 32 and 43(a) of the Lanham Act
and Section 368-d of New York's unfair competition law); <u>Ecore Intern., Inc. v. Downey</u>, 2015
WL 127316 (E.D. Pa.) (reverse passing off and false advertising under the Lanham Act and
common law unfair competition); <u>R.J. Ants, Inc. v. Marinelli Enterprises, LLC</u>, 771 F. Supp. 2d
475 (E.D. Pa. 2011) (trademark infringement and unfair competition under the Lanham Act and
common law unfair competition); 1994 WL 388686

unfair competition claims that may be asserted under Pennsylvania common law. In fact, courts have also uniformly recognized that the common law of trademarks is but a part of the broader law of unfair competition, clearly supporting Plaintiffs' claim that the law of unfair competition under Pennsylvania common law is broad enough to encompass the claims alleged in Count I of their Complaint.

As Judge Padova noted in <u>Giordano v. Claudio</u>, 714 F. Supp. 2d 508, 521 (E.D. Pa. 2010), "[t]he Pennsylvania common law tort of unfair competition is coextensive with the Lanham Act, except for the federal requirement of interstate commerce, (citations omitted), *where a plaintiff's claim focuses on a defendant's appropriation of the plaintiff's 'mark' "with the intent of falsely linking the defendant's product with the plaintiff and capitalizing on the plaintiff's goodwill."* (citations omitted) (emphasis added). Judge Padova further found that, where a state common law claim is not based on false designation, misappropriation of a "mark" or "passing off" of goods, the Lanham Act is irrelevant. Id.

Judge Padova acknowledged that "Pennsylvania common law traditionally defines unfair competition as the 'passing off' of a rival's goods as one's own, creating confusion between one's own goods and the goods of one's rival." (citation omitted). However, he found that "the doctrine of unfair competition in Pennsylvania is not restricted to passing off." Id. And numerous courts have rejected claims that such claims are limited to the Lanham Act. See e.g. <u>Peek v.</u>

Whitaker, 2014 WL 2154965 (W.D. Pa. 2014), EXL Laboratories, LLC v. Egolf, 2011 WL 880453 (E.D. Pa. 2011); American Board of Internal Medicine v. Von Muller, M.D., 2011 WL 857337 (E.D. Pa. 2011); Bro-Tech Corp. v. Termax, Inc., 651 F. Supp. 2d (E.D. Pa. 2009); Eagle v. Morgan, 2011 WL 6739448 (E.D. Pa. 2011); Centimark Corporation v. Jacobsen, 2011 WL 5977668 (W.D. Pa. 2011) Each one of these cases, which are in addition to the cases cited by Judge Padova in Giordano, have also recognized that the Pennsylvania cause of action for unfair competition is "coextensive" with the definition of unfair competition in the Restatement (Third) of Unfair Competition.  Id.

As noted above, a growing number of state and federal trial courts have held that common law unfair competition claims are coextensive with the Restatement (Third) of Unfair Competition, even though no appellate court has formally adopted the Restatement as the law in Pennsylvania.  In McKenna v. Ortho Pharmaceutical Corp., 622 F.2d 657, 663 (3d Cir. 1980) the Third Circuit held that "a federal court attempting to forecast state law must consider relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand."  When neither the state's highest court nor its intermediate appellate courts have spoken on an issue, "federal courts may consider scholarly treatises, **the Restatement of Law**, and germane law review

articles particularly, it seems, of schools within the state whose law is to be predicted."  Id at 662 (citations omitted) (emphasis added)

In addition, trial court decisions may guide a federal court in determining state law.  While this Court is not required to give the same deference to a state trial court decision as it would to a Pennsylvania Supreme Court or intermediate appellate court decision, trial court decisions are entitled to consideration as an indication of what state law is and should be followed, unless the Court is convinced by other persuasive data that the highest court of the state would decide otherwise, especially where such cases represent the "best authority available" in predicting how the state's highest court would rule.  *See* First Nat. State Bank of New Jersey v. Commonwealth Federal Savings and Loan Ass'n of Norristown, 610 F.2d 164, 172 (3d Cir. 1979).

A significant number of federal and state trial courts have employed the analysis described in McKenna and concluded that the Pennsylvania Supreme Court would determine that unfair competition claims under Pennsylvania common law are coextensive with the Restatement (Third) of Unfair Competition.  There is no other persuasive data that indicates that the Pennsylvania Supreme Court would decide otherwise.  Accordingly, this Court should adopt the same position adopted by several other trial courts, including Eastern District Courts that have considered

similar issues and recognized that the Restatement (Third) of Unfair Competition describes the common law of unfair competition in Pennsylvania.

In Synthes (USA) v. Globus Med., Inc., Civ. A. No. 04-1235, 2005 WL 2233441, at *8 (E.D. Pa., Sept. 14, 2005), an Eastern District case, the Court explained that the Restatement (Third) of Unfair Competition recognizes several specific categories of commercial behavior that give rise to a claim of unfair competition, including: (1) deceptive marketing, (2) infringement of trademark and other protectable intellectual property rights, (3) misappropriation of trade secrets and other intangible trade values, and (4) acts or practices that are actionable under federal or state statutes. Synthes at *8; Restatement (Third) of Unfair Competition § 1 (1995). The Restatement also includes a "catch-all" or "residual" category which includes "other acts or practices determined to be actionable as an unfair method of competition, taking into account the nature of the conduct and its likely effect on both the person seeking relief and the public." Synthes at *8; Restatement § 1. Comment g of Section 1 explains the rationale underpinning the "catch-all" provision:

> A primary purpose of the law of unfair competition is the identification and redress of business practices that hinder rather than promote the efficient operation of the market. Certain recurring patterns of objectionable practices form the basis of the traditional categories of liability specifically enumerated in [§ 1]. However, these specific forms of unfair competition do not fully exhaust the scope of statutory or common law liability for unfair methods of competition,

and [the Restatement] therefore includes a residual category encompassing other business practices determined to be unfair.

Id. at cmt. G; <u>Synthes</u> at *8

The comment identifies several business practices that would fall under Section 1's "catch-all" provision, but, as the <u>Synthes</u> court noted, this list is not exhaustive.   Under Section 1 of the Restatement, "[a]s a general matter, if the means of competition are otherwise tortious with respect to the injured party, they will also ordinarily constitute an unfair method of competition." *Restatement (Third) of Unfair Competition* § 1 cmt. g.  Giordano at 522

This broad definition of unfair competition under Pennsylvania common law has been adopted by several Pennsylvania courts to vindicate property rights from unauthorized infringement by a competitor.   In <u>Waring v. WDAS Broadcasting Station</u>, 194 A. 631 (Pa. 1937), the Pennsylvania Supreme Court recognized the right of an orchestra leader's corporation to protect his orchestra's sound recordings from unlicensed broadcasts by a radio station.  Like the present case, the dispute in <u>Waring</u> arose as a consequence of a technological innovation, the ability to broadcast musical recordings on the radio, and it presented issues that had never before been addressed by the courts.[8]

---

[8]  As Justice Stern stated in the opening sentences of his opinion:  "The problems involved in this case have never before been presented to an American or an English court. They challenge the vaunted genius of the law to adapt itself to new social and industrial conditions and to the progress of science and invention."  <u>Waring</u>, 194 A. 631, 632 (1937)

The <u>Waring</u> court stated that there were three major issues: (1) Did plaintiff have an enforceable property right; (2) if so, could he reserve such property right at the time of publication, and (3) did defendant's conduct constitute unfair competition? The answered these questions in the affirmative and found (1) that plaintiff had a property right in his interpretation of a musical composition, even though they were not protected under existing copyright laws; (2) that plaintiff's restriction against broadcasting (printed on the label) was not unreasonable nor against public policy, and (3) that defendant, by its conduct, was guilty of unfair competition.

In addition to his common law copyright infringement claim, the Supreme Court recognized Waring's unfair competition claim as an additional and independent ground upon which the plaintiff was entitled to rely for the protection of its property right against invasion and abuse by the defendant.  Id. at 638 (*citing* <u>International News Service v. Associated Press</u>, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918)).  The Supreme Court explicitly distinguished the claim of unfair competition from other claims, such as fraud or breach of a contractual obligation, and recognized it as an independent cause of action.  *Id*. at 639.  Quoting from the <u>Associated Press</u> case, the Supreme Court noted:

> Obviously, the question of what is unfair competition in business must be determined with particular reference to the character and circumstances of the business. The question here is not so much the

rights of either party as against the public but their rights as between themselves.

*Id*. at 639

In describing the nature of a cause of action for unfair competition, the Court stated:

Stripped of all disguises, the process amounts to an unauthorized interference with the normal operation of complainant's legitimate business precisely at the point where the profit is to be reaped, in order to divert a material portion of the profit from those who have earned it to those who have not; with special advantage to defendant in the competition because of the fact that it is not burdened with any part of the expense [….]. The transaction speaks for itself and a court of equity ought not to hesitate long in characterizing it as unfair competition in business.

Id. at 640

The Supreme Court explicitly stated that claims for unfair competitions are not limited to cases where the defendant attempts to "palm off" its goods or services as those of the plaintiff, which is the most familiar type of unfair competition claim.  *Id*. at 640.  It also recognized that, while, generally speaking, the doctrine of unfair competition rests upon the practice of fraud or deception, the presence of such elements is not an indispensable condition for equitable relief and that, under certain circumstances, equity will protect an unfair appropriation of the product of another's labor or talent.  *Id*.

In Ettore v. Philco Television Broadcasting Corp., 229 F.2d 481 (3d Cir. 1956), the Third Circuit considered a claim of an ex-boxer, who had rights in a

motion picture of his fight against Joe Louis, seeking damages against a television network company for the unauthorized broadcast of portions of the film.   In analyzing the claim under Pennsylvania law, the Third Circuit recognized that the Pennsylvania common law claim of unfair competition extends beyond "passing off" or "palming off" of one's goods as those of another and includes claims "where there has been no fraud on the public but a misappropriation for the commercial advantage of one person of a benefit or a property right belonging to another."  Id. at 490 (citing Waring)  The Third Circuit explicitly held that, if the case at bar were brought before the Pennsylvania Supreme Court, "that Court would probably hold that Ettore's right to control the production of his boxing performance, involving the right to control the scope or reach of his own services, had been impaired by the defendants and consequently would grant damages *on the theory of unfair competition constituting injury to a property right*.  Id. at 490 (emphasis added)

In Pottstown Daily News Publishing Co., v. Pottstown Broadcasting Co., 192 A.2d 657 (Pa. 1963), the Pennsylvania Supreme Court once again affirmed the existence of a common law claim for unfair competition under Pennsylvania common law, which exists separate and apart from statutory claims under the federal copyright statute, and which may be invoked to protect a property right from violation by a competitor using unfair methods of competition.  Id. at

These cases illustrate the general proposition, cited above, that, if the means of competition are otherwise tortious with respect to the injured party, they will also ordinarily constitute an unfair method of competition." *Restatement (Third) of Unfair Competition* § 1 cmt. g.  Giordano at 522  But Comment (a) under Section 1 of the Restatement (Third) of Unfair Competition identifies **the very unfair business practice** that is at issue in the present case, namely unauthorized entry into a market in violation of statute. It provides, in pertinent part:

> This Section does not preclude the imposition of liability when the actor's participation in the market is itself unlawful. One who engages in a particular business or trade in violation of a statute prohibiting such activity, either absolutely or without prescribed permission, may be subject to liability to others engaged in the business or trade if one of the purposes of the enactment is to protect the others against unauthorized competition and the recognition of a private right of action is not inconsistent with the legislative intent. This result is an application of the general principles relating to the imposition of tort liability for violations of legislative enactments that do not explicitly authorize a private cause of action. See Restatement, Second, Torts § 874A.[9]

Pennsylvania courts have long recognized the existence of a private cause of action for unfair competition based on unauthorized entry into a market in violation of statute, even though the statute itself does not provide for such an

---

[9]  Section 874A of the Restatement (Second) of Torts provides:

When a legislative provision protects a class of persons by proscribing or requiring certain conduct but does not provide a civil remedy for the violation, the court may, if it determines that the remedy is appropriate in furtherance of the purpose of the legislation and needed to assure the effectiveness of the provision, accord to an injured member of the class a right of action, using a suitable existing tort action or a new cause of action analogous to an existing tort action.

action.  In <u>Appeal of Douglass</u>, 12 A. 835 (Pa. 1888), the Pennsylvania Supreme Court recognized the common law right to seek injunctive relief to defend ferry franchise rights granted by legislative enactment.  The Court recognized this right despite the fact that the General Assembly did not explicitly provide for a private right of action when it granted the franchise.

Ferry franchises rights granted by the legislature were the precursors to public utility franchises that the PUC and the PPA now grant to public utilities, including Plaintiffs' exclusive franchise rights to provide on demand passenger service in Philadelphia.  In granting certificates of public convenience, the Commission, and now the PPA, perform a purely legislative function; they exercise powers delegated to them by the Legislature to grant franchises.  <u>Horn's Motor Exp. v. Pennsylvania Pub. Util. Comm'n</u>, 26 A.2d 346, 347 (1942)

The Pennsylvania Supreme Court has also recognized other causes of actions in licensed professions, where statutes prohibit unauthorized entry into the profession, but do not explicitly provide a private right of action to licensed professions to enjoin unlawful competition from unlicensed individuals.  *See e.g.* <u>Boggs v. Warner</u>, 94 A.2d 50 (Pa. 1953); See also, <u>Neill v. Gimbel Brothers, Inc.</u>, 199 A. 178 (Pa. 1938) (enjoining the unauthorized practice of optometry)

Although the foregoing cases did not explicitly adopt Section 874A of the Restatement (Second) of Torts, the Pennsylvania Supreme Court did so in <u>Estate of</u>

Witthoeft v. Kiskaddon, 733 A.2d 623 (Pa. 1999), and specifically adopted the three prong test under Section 874A, established by the United States Supreme Court in Cort v. Ash, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), stating: "We believe that the Cort decision offers a beneficial framework within which to analyze whether the statute at issue implicitly creates a private right of action." Id. at 626  The three factors under the Cort decision are:

> [f]irst, is the plaintiff 'one of the class for whose especial benefit the statute was enacted,'-that is, does the statute create a ... right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff?

> Id. at 78, 95 S.Ct. 2080 (citations omitted)(emphasis original).

The most important prong of the Cort test is the second prong concerning indications of legislative intent.  Prior to 2004, the Commission regulated taxicab service throughout Pennsylvania.  Bucks County Services, Inc. v. Philadelphia Parking Authority, 71 A.3d 379, 382-383 (Cmnwlth. Ct. 2013)  With respect to taxicab service in Philadelphia, the Commission's responsibilities had been set forth under the Medallion Act, 66 Pa. C.S. §§ 2401-2416 (now repealed).  Id.  The Medallion Act established heightened standards to elevate the level of on demand transportation service within the City.  Id.

In 2004, the Legislature repealed the Medallion Act and substantially re-enacted it as Chapter 57 of the General Local Government Code, 53 Pa. C.S.

§5701-5745, as amended (commonly known as Act 94). Under Act 94, the regulation of taxicabs and limousines in the City changed from the PUC to the PPA, whose power extends to persons or corporations providing these services between points in the City, from any point in the City to any point in the Commonwealth or outside, and from any point in the Commonwealth to any point in the City if the request for service is by call to a centralized dispatch system. Germantown Cab Co. v. Pennsylvania Public Utility Commission, 97 A.3d 410, 411–12 (Pa.Cmwlth.2014)  The PUC retained jurisdiction over service outside the City of Philadelphia.

As the Supreme Court in Blount described this new regulatory scheme:

> … the Authority shares the responsibility for regulating taxicab operations in the Commonwealth with the Commission. PUC-licensed taxicabs operate statewide. They may transport persons and property "from any point in a city of the first class to any point in this Commonwealth beyond that city of the first class if the request for service for such transportation is received by call to its radio dispatch service." Like PUC-licensed taxicabs, PPA-licensed taxicabs may also travel to other parts of the Commonwealth and to other states. The PPA is responsible for the high volume Philadelphia area while the PUC is responsible for the remaining parts of the Commonwealth. The two agencies' spheres of operation combine and overlap to create a system of ground transportation that is essential to the welfare of the Commonwealth "as a whole."  The PPA and PUC together regulate the totality of Pennsylvania taxicabs and it is essential that the two entities operate harmoniously.

In order to achieve the harmony intended by the General Assembly, the two statutes dealing with on demand passenger service in Pennsylvania must be read *in*

*pari materia*.  Section 1932 of the Statutory Construction Act, 1 Pa. C.S. §1932

provides that statutes that are "in *pari materia* shall be construed together, if

possible, as one statute.  Statutes or parts of statutes are in *para materia* when they

relate to the same persons or things or to the same class of persons or things.  Id.

The Public Utility Code and Chapter 57 of the General Local Government Code

are statutes in *pari materia* because they relate to the regulation of public utilities,

including motor carriers, and more particularly taxicabs.

Furthermore, Section 1962 of the Statutory Construction Act provides that

"[w]henever a statute is repealed and its provisions are at the same time reenacted

in the same or substantially the same terms by the repealing statute, the earlier

statute shall be construed as continued in active operation" and "[a]ll rights and

liabilities incurred under such earlier statute are preserved and may be enforced."

1 Pa. C.S. §1962.

Applying Section 1962 to Act 2004-94, Plaintiffs retain any statutory or

common law rights of action they had under the Medallion Act to pursue claims

against Defendants for violating the statute that prohibits unauthorized call or

demand service in Philadelphia without a medallion and certificate of public

convenience.  The Public Utility Code explicitly provides a private right of action

for violations of its provisions and explicitly provides that its provisions do not

alter or repeal statutory or common law remedies that existed prior to its enactment. See 66 Pa. C.S. §3309.[10]

Clearly, the General Assembly intended for public utilities granted rights to provide service in designated service territories to be able to enforce their rights by initiating private actions against unauthorized service providers. Thus, under the Medallion Act, 66 Pa. C.S. §2401-2417 (now repealed), medallion owners, such as Plaintiffs, had a right to pursue a private right of action against uncertified motor carriers, such as Defendants, providing unauthorized transportation in violation of statutory provisions requiring a medallion and certificate of public convenience prior to providing taxicab service in Philadelphia. They retain this right under the General Local Government Code, even though it does not explicitly provide for a private right of action.

Turning to the other prongs of the Cort analysis, Plaintiffs are part of the class for whose especial benefit the statute was enacted. The medallion system was created "in order to provide holders of certificates of public convenience which authorize citywide call or demand service the opportunity to upgrade and

---

[10]  66 Pa. C.S. §3309(a) provides:  "General rule.--If any person or corporation shall do or cause to be done any act, matter, or thing prohibited or declared to be unlawful by this part, or shall refuse, neglect, or omit to do any act, matter, or thing enjoined or required to be done by this part, such person or corporation shall be liable to the person or corporation injured thereby in the full amount of damages sustained in consequence thereof. The liability of public utilities, contract carriers by motor vehicles, and brokers for negligence, as heretofore established by statute or by common law, shall not be held or construed to be altered or repealed by any of the provisions of this part."

improve operations of taxicabs."   See 66 Pa. C.S. §2402 (now repealed and substantially reenacted 53 Pa. C.S. §5712)   Section 2403 of the Medallion Act provides that "medallions are property and may not be revoked or canceled by the Commission."   66 Pa. C.S. §2403 (now repealed and substantially reenacted as 53 Pa. C.S. §5713)

Recognizing a private right of action to permit medallion owners to vindicate their property rights from infringement by unauthorized service providers satisfies the third prong of the Cort analysis because it enables medallion owners to vindicate their property rights from infringement by unauthorized competition, which promotes the underlying purposes of the statute to achieve clean, safe, and efficient taxicab service in Philadelphia.

For all of the foregoing reasons, Plaintiffs assert that they have a private right of action under the General Local Government Code to enforce their medallion property rights against Defendants' unauthorized competition in violation of statute, even though the statute does not explicitly provide for such an action.  Such an action supports each of the claims asserted in Plaintiffs' complaint that rely on Defendants' violation of statute as an element.

### d. Plaintiffs have plead facts sufficient to support a False Advertising Claim under the Lanham Act

In paragraphs 204-233 of their Complaint, Plaintiffs alleged that "[o]n October 24, 2014, advertisement contained the following statement:  "This week

the largest taxi insurer went bankrupt, which means that as of 5:00 p.m. today, there is no guarantee that your taxicab will be insured." The October 27, 2014, tweet, which links to the blog post on Uber's website contains the following statement:

> In October, the largest taxi insurer in Pennsylvania went bankrupt. Many uninsured taxis are still on the road; though some may have new policies, **there's no guarantee that your taxi ride will be insured**.

(emphasis in the original)

The statement refers to First Keystone Risk Retention Group ("First Keystone"), which insured many of the Taxicab Medallion Plaintiffs. On October 21 2014, the South Carolina Court of Common Pleas for the Fifth Judicial Circuit in Richland County, South Carolina, initiated liquidation proceedings against First Keystone. The South Carolina Court ordered, *inter alia*, that all existing policies of insurance be cancelled as **of November 20, 2014**, as a consequence of First Keystone's insolvency.

On October 22, 2014, the Authority notified all First Keystone policyholders with proof of insurance on file with the Authority to obtain replacement insurance coverage by October 24, 2014, at 5:00 p.m., or risk being placed out-of-service by the Authority. Immediately upon receipt of the Authority's notice, all of the aforementioned First Keystone policy holders, including Medallion Taxicab Plaintiffs, initiated the process of obtaining replacement coverage by submitting

applications for insurance and necessary supporting documents, including loss runs, to licensed insurance carriers authorized to provide insurance coverage in this Commonwealth.   By October 24, 2014, almost all of the aforementioned First Keystone policyholders, including all of the Taxicab Medallion Plaintiffs, had obtained replacement insurance coverage and the rest were awaiting underwriting approval.

In light of this development, the Authority elected not to place any of First Keystone policyholders out-of-service and extended the out-of-service deadline to October 27, 2014.   By October 27, 2014, all of the Taxicab Medallion Plaintiffs had obtained replacement coverage and only a handful of other First Keystone policyholders had failed to obtain replacement coverage.   No First Keystone policyholders were ever placed out of service and no medallion taxicabs operating in Philadelphia were ever uninsured as a consequence of the First Keystone liquidation because the First Keystone policies remained into effect until November 20, 2014, or the date of any replacement coverage.

On the same day the first of the aforementioned advertisements were published, October 24, 2014, Raiser-PA, LLC ("Raiser-PA"), a wholly owned subsidiary of Defendant Uber, filed an Application for Emergency Temporary Authority with the Commission, seeking authorization to provide UberX service in Philadelphia and its surrounding counties.   The Application was filed by means of

interstate wires and by mail.  In its application, Raiser-PA asserts that the initiation of liquidation proceedings against First Keystone was an emergency affecting public safety that required immediate action by the Commission to approve its Application for Emergency Temporary Authority.

In its application, Raiser-PA certified that it was not currently engaged in unauthorized intrastate transportation for compensation between points in Pennsylvania and would not engage in such transportation unless and until such authorization was received from the Commission.  This certification was false because Rasier-PA is the alter ego of Defendant Rasier or Defendant Uber, which has been actively engaged in providing unauthorized intrastate transportation in Pennsylvania and at the time the Application was filed had every intention of engaging in unauthorized intrastate transportation in Philadelphia, in fact, on the very day it filed the Application.

The false certificate was in furtherance of the scheme of Defendant Uber to defraud regulators by attempting to obtain authorization under false pretenses. Based on the foregoing, the statement, "as of 5:00 p.m. today, there is no guarantee that your taxicab will be insured," is literally false.  It was literally false because First Keystone insurance coverage was not cancelled as of 5:00 p.m. on October 24, 2014, it was cancelled as of November 20, 2014, or the date replacement coverage was secured, whichever was earlier.

The Authority set a deadline of October 24, 2014, at 5:00 p.m. for First Keystone to get replacement coverage or be placed out of service and Defendants Uber and Feldman knew that this was the only significance for that date and time. Yet they intentionally mislead the public in stating that "as of 5:00 p.m. today, there is no guarantee that your taxicab will be insured."  Likewise, the statement published in the tweet of October 17, 2014, stating that "many uninsured taxis are still on the road" was also literally false in that no taxicabs were ever uninsured and only a small number of taxicabs had not yet secured replacement coverage.

Viewed in conjunction with the false and misleading application filed by Uber subsidiary, and alter ego, Rasier-PA, the statements in the advertisement clearly establish the intent to deceive not only the riding public but state regulators regarding the relative safety of competing taxicab services by disparaging First Keystone policyholders, including the Medallion Taxicab Plaintiffs.  The false statements were designed to undermine consumer expectations regarding the insurance status of the Medallion Taxicab Plaintiffs and to discourage consumer from using their taxicab services and to use the unauthorized Uber services.

Defendants first argue that Plaintiffs have not alleged facts to show that any of the challenged statements are literally false.  But the foregoing allegations regarding the bankruptcy of First Keystone Risk Retention Group and the cancellation of its policies were literally false at the time they were made.  First

Keystone did not file for bankruptcy and none of its policies were cancelled within the time frame alleged by Defendants. This makes the statements literally false. The scramble by Plaintiffs and others to obtain replacement coverage was not because of any gap in coverage, but rather because of the Authority's insistence that policy holders obtain replacement coverage immediately, rather than wait until the actual cancelation date specified by the Court under the liquidation order. Accordingly, Defendants contention is without merit. To the extent the Court finds them inadequate, Plaintiffs seek leave to amend their complaint to allege additional facts to make to clear that the statements regarding the insurance situation occasioned by the liquidation order entered against First Keystone are more clear.

Second, Defendants claim that Plaintiffs have failed to allege that Defendants' actions proximately caused Plaintiffs to suffer harm. But Paragraph 241 alleges that Plaintiffs have suffered, are suffering, and will continue to suffer damage to their businesses, reputation, and goodwill, and the loss of sales and profit Plaintiffs would have generated but for the acts of these Defendants. To the extent that this paragraph is not sufficient to put Defendant on notice of the nature of Plaintiffs' damages, Plaintiff seeks leave to amend their complaint to allege additional facts if the Court deems them inadequate. To the extent Plaintiff alleges that Defendants' actions were intended to cause harm sufficient to constitute an injury under the Lanham Act, but did not alleged that the intended harm actually

occurred, Plaintiffs seek leave to amend their complaint to make it clear that such harm in fact occurred.

### e. Plaintiff have sufficiently pleaded causes of action under RICO with regard to standing, compensable injury, proximate cause, and conspiracy.

Broadly speaking, a RICO violation results from the use of power, acquired by crime, to gain or maintain a foothold in an enterprise that operates in interstate commerce. In order to understand the elements of a civil RICO cause of action, it is necessary to refer to three different sections of the Act. Subsection 1964(c) provides a RICO claimant with a private right of action. Subsection 1964(c) reads as follows:

> Any person injured in his business or property by reason of violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of suit, including a reasonable attorney's fee.

18 U.S.C. § 1964(c).

"Although there can be little doubt that criminal infiltration of businesses and injury to free competition in the marketplace were major concerns of Congress in enacting RICO, it is also clear that Congress's concerns extended much farther." Haroco, Inc. v American Nat. Bank and Trust Co. of Chicago, 747 S. 2d 384 (7th Cir. 1984) quoting United States v. Turkette, 452 U.S. at 590–91, 101 S.Ct. at 2532–33. A business competitor harmed by infiltration or by other effects of racketeering is able to state a claim under RICO by alleging a "competitive" injury.

Haroco, Inc. v American Nat. Bank and Trust Co. of Chicago, 747 S. 2d 384 (7th Cir. 1984) See, Addis v. Moser, No. 83 C 6118, slip op. at 14 & n. 9 (N.D.Ill. Feb. 15, 1984); Landmark Savings & Loan v. Loeb Rhoades, Hornblower & Co., 527 F.Supp. 206, 208–09 (E.D.Mich.1981) (competitive injury is cognizable under RICO). While a competitive injury is sufficient to sustain a RICO claim, a competitive injury is not necessary to state a RICO claim.

Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479 (1985) also blended elements of competitive injury and indirect injury into its racketeering injury requirement. The Sedima opinion talks not only about mobsters but also about "systemic harm to competition and the market," which thereby injures "investors and competitors." 741 F.2d at 496. The Sedima court said it was not importing every detail of the standing requirements from antitrust law; for example, it said that an actual anticompetitive effect need not be proved if the injury were of the type which would ordinarily threaten competition. Id. at 495–96 & n. 41.

Primary consideration in determining whether plaintiff's injuries have been proximately caused by defendant's RICO violations is the directness of the relationship between the injury asserted and the injurious conduct alleged.   Bieter Co. v. Blomquist, C.A.8 (Minn.) 1993, 987 F.2d 1319. In the case of Commercial Cleaning Services, L.L.C. v. Colin Service Systems, Inc., 271 F.3d 347 (2d. Cir. 1991), the plaintiff and the defendant were direct competitors in the laundry

business, and the defendant allegedly obtained an unfair advantage from hiring hundreds of undocumented aliens at low wages. Id. at 378–79. The court reasoned that, because the plaintiff and the defendant were direct competitors, damages were readily discoverable and such damages did not apply to plaintiffs outside the category of direct competitors, involving no complicated task of ascertaining and apportioning damages. The Court of Appeals noted: "There is no class of potential plaintiffs who have been more directly injured by the alleged RICO conspiracy than the defendant's business competitors...." Id. Therefore, the court found that the plaintiff's claim satisfied the "proximate cause" requirement. Id. at 378.

Here, Plaintiffs meet the requirements of 1964(c) because they have suffered a harm and competitive injury to their business and property from Defendants' wrongful acts of enabling the fraud and misrepresentation made to the public regarding Plaintiffs as direct competitors. Not only have Plaintiffs lost hundreds of thousands of dollars in the market, Defendants have also conspired in publishing false and misleading statements to disparage the reputation of Plaintiffs and confuse consumers.

**Plaintiffs have pled sufficient facts to establish a claim under §1692(c)**

For the reasons set forth above, Plaintiffs' allegations that Defendants have violated criminal statutes involving unauthorized taxicab service and collected fares from the riding public for the provision of such unauthorized service using

interstate wires are sufficient to establish a fraud upon the public sufficient to constitute the predicate acts of wire fraud necessary to establish a RICO claim. Likewise, Plaintiffs' allegations regarding Defendants' use of interstate wires to broadcast disparaging and false claims about Plaintiffs' service and insurance status is sufficient to establish a RICO claim based predicate acts of wire fraud.

As to Defendants remaining claims relating to standing, proximate cause, compensable injury and conspiracy, Plaintiffs hereby incorporate the arguments set forth in their memorandum in opposition to Google's Motion to dismiss.

CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request this Honorable Court to deny the Motions to Dismiss of the Uber Defendants.

Respectfully Submitted,

*Michael S. Henry*
_____
MICHAEL S. HENRY, ESQUIRE
ZACHARY L. GRAYSON, ESQUIRE
SELAH T. WYCHE, ESQUIRE
Salaman, Grayson & Henry, P.C.
100 S. Broad Street, Suite 650
Philadelphia, PA 19110
Telephone (215) 568-1500
Fascismile (215) 557-6353

Date: April 13, 2015

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CHECKER CAB OF PHILADELPHIA, et al., | : | |
| | : | |
| | : | |
| PLAINTIFFS | : | Case No.: 2:14-cv-07265 |
| | : | |
| V. | : | |
| | : | |
| UBER TECHNOLOGIES, INC., et al. | : | Notice of Appeal |
| | : | |
| | : | |
| DEFENDANTS | : | |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this day, April 13,, 2015**,** a true and correct copy of the foregoing Motion and Brief in Opposition to Defendant Google Ventures, LLC's Motion to Dismiss were served via Electronic and U.S. Mail upon the following person(s):

Stephen Swedlow, Esq.
Arthur M. Roberts, Esq.
Quinn Emanuel Urquhart & Sullivan, LLP
50 California Street, 22nd Floor
San Francisco, CA  94111

A.  Scott Bolden, Esq.
Carolyn Short, Esq.
Shannon E. McClure, Esq.
Nipun J. Patel, Esq.
Reed Smith, LLP
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, PA  19103-7301

David P. Temple, Esq.
James Hickey, Esq.
Gallagher, Malloy & Georges, P.C.
1760 Market Street – 11th Floor
Philadelphia, PA  19103

Tonya Michelle Harris, Esq.
Wesley R. Payne, Esq.
White and Williams, LLP
1650 Market Street,
One Liberty Place Suite 1800
Philadelphia, PA 19103


*Michael S. Henry*
**Zachary L. Grayson, Esq.**
**Salaman Grayson & Henry, P.C.**
**100 South Broad Street, Suite 650**
**Philadelphia, PA  19110**
**Attorney for Plaintiffs**